ESTATE OF LEE J. CLAY, DECEASED, MARY LOUISE CLAY, PERSONAL REPRESENTATIVE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 21714-83.     Filed June 23, 1986.

*Bill Bowman*, for the petitioners.
*Michael J. Cooper*, for the respondent.

WHITAKER, *Judge*: Respondent determined a deficiency of $18,712 in petitioner's Federal estate tax. After concessions, the sole issue for decision is whether petitioner's gross estate includes a pro rata portion of proceeds received from an insurance policy on the life of Lee J. Clay, deceased, where the policy premiums were paid from a joint checking account funded by decedent and his wife.

#### FINDINGS OF FACT

Some of the facts have been stipulated, and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Decedent and Mary Louise Clay (Clay) were husband and wife at all times during decedent's life relevant herein. Decedent died of a heart attack on October 7, 1979, at the age of 48. Clay resided in Bristol, Colorado, at the time the petition herein was filed.

Decedent and Clay lived on Cottonwood Ranch (Cottonwood), a farm and cattle ranch in Colorado. Decedent was responsible for Cottonwood's operating activities, which included managing cow and beefalo herds, maintaining the ranch, and supervising the artificial insemination of livestock. Clay was responsible for the financial aspects of running both the ranch and the household, which included keeping the books, maintaining bank accounts, and supervising financial planning. Family expenses were paid with funds withdrawn from the family's joint checking account (account) and their respective earnings were deposited to the account. This was the family's only checking account, and the majority of checks drawn upon the account were signed by Clay.[1]

Cottonwood Ranch, Inc. (Cottonwood Inc.), was one of three corporations inherited by Clay, her mother Louise Wilson (Mrs. Wilson), and her brother Bill Wilson (collectively referred to as the Wilson family) from Clay's father on his death. Mrs. Wilson owned 52 percent of Cottonwood Inc.'s stock, with Clay and Bill Wilson owning the remainder. As majority shareholder, Mrs. Wilson made many of the significant financial decisions affecting Cottonwood Inc. The other corporations inherited by the Wilson family were Elco Mining (Elco) and Wilson Construction. Elco was operated by Bill Wilson and Wilson Construction was essentially a shell corporation. The Wilson family met periodically to discuss issues concerning the family corporations. At no time did decedent own stock in Cottonwood Inc., Wilson Construction, or Elco.

In February 1974, Mrs. Wilson arranged to meet with Ronald L. Osborn (Osborn), an agent for the Equitable Life Assurance Society of the United States (Equitable). Equitable had made a loan to Mrs. Wilson in connection with Cottonwood Inc. As an Equitable agent, Osborn had access to Mrs. Wilson, whom he contacted in an attempt to interest her in an insurance policy. Mrs. Wilson initially met

---

[1]Decedent and Clay also maintained three savings accounts with an aggregate balance on the date of decedent's death of $12,881.75. Each of these accounts was listed as jointly owned property on decedent's estate tax return. Clay transferred funds between the checking and savings accounts in an attempt to maximize the interest earned. Petitioner does not contend, however, that funds deposited to the savings accounts prior to the issuance of the policy were used to make the premium payments.

with Osborn some months later. Osborn and the Wilson family were present at this meeting, but decedent was not. Osborn spoke with Mrs. Wilson about her estate planning needs generally, but made no specific proposals. It was at this initial meeting that Osborn learned of the Wilson family corporations, their ownership, and operations. There was no discussion of purchasing insurance on either decedent or Bill Wilson at the meeting. Neither Clay nor decedent had met Osborn or discussed insurance with him prior to this time.

Osborn and the Wilson family met a second time between 3 and 6 months later. Decedent was not present at this meeting. Based on information gathered pursuant to a "factfinder," Osborn concluded that, in the event of Mrs. Wilson's death, her estate would be faced with a severe liquidity problem. Clay and Bill Wilson purchased a policy on Mrs. Wilson's life at this time in accordance with Osborn's recommendation.

It was at this second meeting that Osborn initially suggested the purchase of "key man" insurance on decedent and Bill Wilson.[2] Based on the information gathered at the first meeting, Osborn observed that decedent and Bill Wilson were "key in the total picture of the Wilson family," in that the death of either decedent or Bill Wilson would require the sale of substantial assets to cover the cost of replacing their expertise. Thus, the purpose of the proposed insurance was to protect the Wilson family and their assets in the event of either decedent's or Bill Wilson's untimely death. No policy was purchased on decedent or Bill Wilson at the second meeting. In 1975, Bill Wilson was seriously injured in an accident. The problems created by his absence impressed upon Clay and Mrs. Wilson the importance of decedent and Bill Wilson to the operation of Cottonwood Inc. and Elco.

Over the next several years, Osborn visited Cottonwood 8 or 10 times in an attempt to sell Clay a policy on decedent's life. Osborn described his contacts with decedent and Clay, and the circumstances surrounding his sale of the policy to them, as follows:

---

[2]"Key man" insurance is generally purchased by companies to protect them on the death or disability of a valued employee.

A. Well, I suspect that I had had—see Lee [decedent] never was,—Lee was always out in the field or out with the cattle or something like that. Very seldom did I see Lee. Most of my conversation was with Mary Louise [Clay]. And—because Mary Louise was at the house and actually it was my understanding—and I think it's true—that Lee didn't own any of that corporation and that the corporation would go under if something happened to Lee. And I would say probably 90 percent of my conversations would be with Mary Louise and it probably started like maybe in July or August and I periodically would stop in and, you know, visit and say have you given any more thought to this. Have you talked to your mother about—

Q. Well, who directed you to go ahead and write that policy?

A. Well, I made a call on them—Louise [Clay] agreed that, yeah, something—if something was going to happen to—if something were to happen to Lee, that the Cottonwood Ranch would be in serious trouble. But as an insurance agent psychologically I'm not sure they were ready to buy it at that point in time. And when Bill [Bill Wilson] had his accident I think that brought it really home to Louise that they could be in serious trouble if something were to happen to Lee. So she said that yes, that they had to have insurance on Lee or else they would be in serious trouble.

Osborn's contacts with decedent were minimal, and Osborn's only recollection of discussing insurance with him was at the time the application was completed. Decedent never made any inquiries to Osborn concerning the possibility of writing a policy on his life, but neither did decedent refuse to have the policy taken out. The decision to do so was made by Clay based on Osborn's recommendation.

Due to Cottonwood Inc.'s cash-flow problems, Osborn suggested that Clay, and not Cottonwood Inc., own the policy and pay the premiums. Additionally, Osborn suggested that the policy be held in Clay's name for estate tax purposes. Thus, Clay's ownership of the policy and payment of the premiums were a result of both business necessity and prudent estate planning. The policy itself, however, was necessitated by decedent's role in the operation of Cottonwood. The insurance was needed to give Clay the time and money necessary to reorganize Cottonwood Inc. in the event of decedent's death. The policy application was filled out by Osborn, and was signed by Clay as the "Purchaser" and by decedent as the "Proposed Insured." Decedent was required to complete and sign a questionnaire concerning his health. The policy expressly provided that no insurance would take effect until the full first premium was paid.

On December 28, 1978, an individual life insurance policy (policy) was issued by Equitable, naming decedent as the insured and Clay as the purchaser, owner, and beneficiary. The policy provided for proceeds in the amount of $320,689. The first premium was paid with a check signed by Clay.[3] Clay understood herself to be the owner of the policy and responsible for the premium payments. Clay made an independent decision as to her ability to pay the premiums based on the assets available to her.

Premium notices were sent to Clay on a monthly basis. Clay wrote seven premium checks totaling $6,155.88 and borrowed against the surrender value of the policy to make additional premium payments in the amount of $3,473.57. Clay also paid interest on the loans against the policy's surrender value in the amount of $3,409.34. Thus, a total of $13,038.79 was paid on the policy. All premium payments on the policy were made by Clay with checks drawn on the account.

During this period, decedent was receiving royalty payments from an oil royalty interest inherited from his father. The royalty payments constituted the majority of income reported on decedent's and Clay's joint 1979 income tax return. The amount of royalties received in 1978 was undetermined. Decedent and Clay were drawing a salary of approximately $1,000 and $300 a month, respectively, from Cottonwood Inc. These amounts, plus the royalties, were deposited in the account. Between December 28, 1978, and the date of decedent's death, Clay made contributions to the account constituting approximately 27 percent, and decedent made contributions constituting approximately 73 percent, of the total contributions made to the account. Respondent determined that $231,536 of the total proceeds of $320,990 were includable in decedent's gross estate based on the ratio of decedent's and Clay's contributions to the account during the period in which premium payments were made.

---

[3] The application for insurance states that $1,074.29 was paid with the application, whereas Clay's check was for only $540. This discrepancy is not resolved in the record, but it does not affect our decision in the case.

ULTIMATE FINDINGS OF FACT

(1) The policy was purchased as key man insurance to cover the cost of replacing decedent's expertise.

(2) Clay purchased the policy on her own initiative and not at the direction or behest of decedent.

(3) Clay made payments from the account with decedent's knowledge and consent.

OPINION

The sole issue for decision is whether decedent's gross estate includes proceeds from the policy in proportion to decedent's deposits to the account. Relying on *Estate of Kurihara v. Commissioner*, 82 T.C. 51 (1984), respondent contends that, because decedent contributed 73 percent of the funds deposited to the account and the premiums were paid with funds withdrawn from the account, decedent paid 73 percent of the premiums. Respondent concludes that decedent thereby transferred an interest in the policy to Clay within the purview of section 2035.[4] Petitioner argues that decedent had no interest in the policy and, therefore, could not have made the proscribed transfer.

Section 2035(a) provides that "the value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, during the 3-year period ending on the date of the decedent's death." A transferable interest has been found to exist where an insurance policy is procured at the instance of a decedent within the presumptive period and the premiums are paid either directly or indirectly by the decedent. See *Detroit Bank & Trust Co. v. United States*, 467 F.2d 964 (6th Cir. 1972), cert. denied 410 U.S. 929 (1973); *Bel v. United States*, 452 F.2d 683 (5th Cir. 1971), cert. denied 406 U.S. 919 (D. Or. 1972); *First National Bank of Oregon v. United States*, 488 F.2d 575 (9th Cir. 1973), affg. 352 F. Supp. 1157 (1972); *Estate of Kurihara v. Commissioner, supra*. These transactions are considered the functional equivalent of a decedent's purchasing a policy in his own name within 3 years

---

[4] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue.

of death and immediately assigning all ownership rights therein to the named beneficiaries.

In *Estate of Kurihara*, the decedent initiated an insurance policy on his life, created an irrevocable trust for the benefit of his spouse and children, and assigned to the trustees his interest in said policy. The decedent then drew a check to a trustee for an amount exactly equal to the policy's annual premium, making a notation on the check that the funds were for payment of the premium. The trustee merely endorsed the check over to the insurance company in payment of the first premium. In determining whether the decedent had a transferable interest in the policy, we concluded that the controlling questions were: (1) Did the payment of the initial premium within the proscribed 3-year period create the ownership rights in the policy, and (2) did the decedent pay that premium? We held that the payment of the initial premium did create ownership rights in the policy, and that the trustees acted as the decedent's agent in making the payments. Therefore, the proceeds were included in the decedent's gross estate. Respondent now asserts that *Estate of Kurihara* is controlling on the facts before us.

As to the first question, the policy was by its terms not effective until the first premium was paid. Therefore, in reliance upon *Estate of Kurihara*, we conclude that Clay's payment of the premiums created her ownership rights in the policy.

As to the second question, respondent contends that the tracing of decedent's deposits to the account, and the payment of premiums from the account, constitute the payment of premiums by decedent. Additionally, respondent asserts that Clay was acting as decedent's agent when paying the premiums. Therefore, respondent concludes that 73 percent of the premiums were paid by decedent and that 73 percent of the proceeds should be included in his gross estate.

We think respondent's tracing analysis is an unwarranted extension of *Estate of Kurihara*. The ultimate questions formulated in that case were based largely on a synthesis of *Detroit Bank*, *Bel*, and *First National Bank of Oregon* and must be understood in that context. In each of those cases,

as well as in *Estate of Kurihara*, the decedent was the initiator of the insurance policy and was the one who physically paid, or provided the funds to his agent to pay, the premiums. The significance of the emphasis upon payment is not as to the source of the funds; rather, it is the act of making payment and the control of the entire transaction reflected in this act. Respondent's tracing of the funds used for the premium payments is reminiscent of the now abandoned premium payment test under section 2042. Where parties maintain joint bank accounts, each co-tenant is not necessarily the agent of the other co-tenant. Therefore, premium payments made with funds withdrawn from a joint account are not per se made by the nonwithdrawing co-tenant.

The nature of a party's legal interest in property is a matter of State law. *Aquilino v. United States*, 363 U.S. 509, 512-513 (1960); *Morgan v. Commissioner*, 309 U.S. 78, 82 (1940). There is a wide divergence of views as to the rights, interests, and powers of joint account depositors, which in some instances are based upon rebuttable or conclusive presumptions. See in general 10 Am. Jur. 2d, Banks, secs. 377-389 (1963); 41 Am. Jur. 2d, Husband and Wife, sec. 79 et seq. (1963). In some States, including Colorado, statutes have clarified or modified the rules. Thus, banks may pay funds to any one of the joint depositors without liability and such accounts are for this purpose treated as owned in joint tenancy with right of survivorship. Colo. Rev. Stat. sec. 11-6-105 (1975). However, during the lifetimes of the joint depositors, the funds in a joint account are deemed to belong to the parties "in proportion to the net contributions by each to the sums on deposit, unless there is a preponderance of evidence of a different intent." Colo. Rev. Stat. sec. 15-15-103 (1975).

Neither party has commented upon these statutory provisions or upon the law generally prevailing and no Colorado case has come to our attention which is helpful. Neither do we have in this record the contract between the depositors and the bank. Even though such contracts are primarily for the protection of banks, they may, nevertheless, create contract rights between the parties. See, e.g., *Vesey v. Vesey*, 237 Minn. 295, 54 N.W.2d 385 (1952). Nevertheless,

we assume, as the parties do, that each tenant to this joint account had the power to withdraw the whole or any part of funds in the account, even though during the lifetime of Clay and the decedent, the funds belonged to them in proportion to their net contributions. Clay managed the bank account with the concurrence of the decedent. The withdrawal of funds with decedent's knowledge and consent constituted a transfer of those funds by decedent to Clay, terminating his interest therein. Therefore, under the circumstances of this case, we reject respondent's tracing analysis and hold that, in the absence of an agency relationship, the mere payment of premiums with funds withdrawn from a joint account does not constitute payment by the nonwithdrawing tenant.[5]

Respondent also contends that decedent paid the premiums through Clay, who was acting as his agent in signing the checks. We have found that Clay initiated the issuance of the policy. Decedent's only involvement was signing the application and submitting to a medical examination. Cooperation in the issuance of the policy is substantially different than acting as the moving force behind it. Looking to the facts and circumstances surrounding the acquisition of the policy and the payment of the premiums, it was Clay's conception, guidance, and payment—with no small prompting by Osborn—that created her rights as owner and beneficiary of the policy. Clay was not acting as decedent's agent. Respondent points to no facts upon which an agency of the kind we found in *Estate of Kurihara* could be predicated. Payment by decedent in this case did not occur.

*Decision will be entered for the petitioner.*

---

[5] It has been well said that "the intent of the parties in opening a joint checking account would be frustrated by a process of severance and tracing of assets simply because they were purchased with a check drawn on the joint account." *Beisbier v. Pesch*, 47 Wis. 2d 409, 177 N.W.2d 919, 923 (1970).