ESTATE OF JOAN SCHNACK, DECEASED, WILLIAM D. SCHNACK, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
ESTATE OF SCHNACK v. COMMISSIONER
Docket No. 35519-83
United States Tax Court
T.C. Memo 1986-570; 1986 Tax Ct. Memo LEXIS 35; 52 T.C.M. (CCH) 1107; T.C.M. (RIA) 86570; December 1, 1986; REVERSED AND REMANDED May 25, 1988 *35 Life insurance policies were purchased on decedent wife's life, with premiums being paid with funds withdrawn from husband and wife's joint checking account. Held, agency relationship existed so that payment of insurance premiums by one joint tenant, wife, constituted payment by the non-withdrawing tenant, husband. Therefore, decedent wife did not have a transferable interest in the policies within the purview of sec. 2035. Estate of Clay v. Commissioner,86 T.C. 1266 (1986), followed. Lawrence A. Nestel, for the petitioner. Rebecca Hill, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined a deficiency of $199,260 in petitioner's Federal estate tax. The issues presented are (1) whether the gross estate should include the value of life insurance policies on decedent's life and (2) whether the gross estate should include the value of proceeds receivable from life insurance policies on decedent's life. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulations and exhibits attached thereto are incorporated herein by this reference. Petitioner is the Estate of Joan Schnack, represented by its executor, *36 William D. Schnack (hereinafter "Dr. Schnack"). At the time he filed the petition herein, Dr. Schnack resided in Weed, California. In 1978, Larry Cronin and J. G. Murphy, insurance agents (hereinafter the "agents"), contacted decedent and her husband, Dr. Schnack, to ascertain their life insurance needs and should there be a need, ell them life insurance. Dr. Schnack was initially not interested in obtaining life insurance. The agents, however, continued to contact decedent and on September 27, 1978, received permission to obtain information from the Schnacks' certified public accountant/lawyer, Lawrence Nestel (hereinafter "Nestel"). On November 10, 1978, after meeting with Nestel, the agents met with and represented to decedent and Dr. Schnack that, in the event of the death of either Schnack, the estate of the deceased would face severe liquidity problems. At this meeting, decedent and Dr. Schnack agreed to and did apply for $500,000 worth of life insurance each. The agents spoke with Dr. Schnack three times later in November and met with decedent and Dr. Schnack on December 31, 1978, with respect to the policies. At this meeting, Dr. Schnack informed the agents that he and *37 decedent were not then ready to purchase life insurance. In March of 1979, Dr. Schnack called the agents and stated that he and decedent were then ready to purchase life insurance. The agents met with Dr. Schnack on March 21, 1979, and decedent on March 24, 1979, to complete the necessary paperwork for issuance of life insurance policies. At the March 24, 1979, meeting with decedent, decedent executed an amendment to the application she had completed in November 1978. A life insurance policy on decedent's life in the amount of $500,000 was issued pursuant to the 1978 application and the 1979 amendment thereto (hereinafter the "first policy"). Some time during June of 1979, Dr. Schnack telephoned the agents to discuss the insurance coverage on his and decedent's lives. In this conversation, the agents convinced Dr. Schnack to increase the coverage on decedent's life from $500,000 to $1,000,000. The agents sent to Dr. Schnack the necessary application and subsequently received back a completed application. The agents did not communicate with decedent with respect to this second application. A policy was issued pursuant to this second application (hereinafter the "second policy"). *38 The agents, both of whom had a workable understanding of Federal estate tax law as it relates to life insurance, realized that the effectiveness of the life insurance in alleviating the estate liquidity problem would be greatly hampered if the policies were included in the estate. They therefore attempted to arrange the policies in such a way that the policies would be excluded from the gross estates. To this end, the policies on Dr. Schnack's life were purchased and owned by a pension plan in which he was a participant. Since decedent was not a participant in a pension plan similar to Dr. Schnack's, a somewhat more elaborate procedure was devised by the agents with respect to the policies on her life. First, the agents advised the Schnacks to designate Dr. Schnack as the owner, beneficiary, and applicant of the policies on decedent's life. Second, they advised the Schnacks to pay the premiums on the policies on decedent's life with funds which did not belong to decedent. Specifically, they suggested that such premiums be paid out of a separate bank account owned by Dr. Schnack and that decedent execute a document entitled "Release of Community Property Interests in Life Insurance *39 Policy" ("Release"). [1]
The Schnacks fully followed the agents' first suggestion. Dr. Schnack was listed as the owner, beneficiary, and applicant on two applications for life insurance on decedent's life. [2] He signed both applications as applicant. Decedent was listed as and signed as insured on both applications. Policies were issued by New York Life Insurance Company ("New York Life") consistent with the applications. Each policy became effective upon payment of its initial premium. The Schnacks only partially complied with the agents' second suggestion. The initial *40 premiums [3] on both policies were paid by checks signed by decedent drawn on a Crocker National Bank (hereinafter "Crocker") checking account (hereinafter the "Crocker account"). All further premium payments were to be made from the Crocker account pursuant to a check-o-matic arrangement [4] authorized by Dr. Schnack. The Crocker account was the only personal checking account the Schnacks maintained, jointly or separately. It was funded by decedent's annual income of $50,000, Dr. Schnack's annual income of $50,000 to $60,000, and proceeds from investments owned by decedent and Dr. Schnack. The agreement among decedent, Dr. Schnack, and Crocker clearly indicated that the Schnacks owned the account as joint tenants with rights of survivorship. Crocker was permitted to pay all of the money in the account to or to the order of either decedent or Dr. Schnack, during their lifetimes. Further, Crocker was permitted to pay all of the money in the account to or to the order of their survivor. Although they owned the account as joint tenants and both had signatory authority over the account, decedent managed the account and wrote nearly all of the checks. Dr. Schnack would write approximately *41 only one percent of the checks written on the Crocker account. If he wanted a check to be drawn in a particular amount to a particular payee, he would usually inform decedent and she would draw a check accordingly. The Schnacks' failure to follow the agents' suggestion to use a separate account to make the premium payments was due to the fact that Dr. Schnack did not have a separate account. [5] As manager of and primary check writer on the only personal account of which Dr. Schnack had an interest, decedent drew the checks for the initial premium payments with the understanding that the funds represented by the checks were dr. Schnack's separate funds. Decedent followed Dr. Schnack's *42 directions to draw the checks payable to New York Life, just as she would follow his directions to pay other bills. Although they did not comply with the agents' specific suggestion that the premium payments be made from a separate account of Dr. Schnack's, both of the Schnacks believed that they were complying with the agents' suggestion that the premiums be paid with funds that did not belong to decedent. Decedent followed the agents' suggestion to execute a Release with respect to the first policy but, because of an oversight, did not execute a Release with respect to the second policy. As stated earlier, the policies were issued consistent with the applications. The first policy was mailed and received by Dr. Schnack prior to decedent's death. The second policy was mailed on August 9, 1979, the date of decedent's death. New York Life paid $500,000 *43 of insurance proceeds to Dr. Schnack on the first policy. However, New York Life paid only $200,000 with respect to the second policy. Dr. Schnack has sued New York Life in state court seeking recovery of the additional $300,000. [6]
The Federal estate tax return did not include in the gross estate any amount with respect to the policies. Respondent determined that the value of decedent's interest in both policies should have been included in petitioner's gross estate. He determined that the value of decedent's interest in the policies was $425,000. [7] *44 Accordingly, in respondent's statutory notice of deficiency, he increased the gross estate by $425,000 and determined a deficiency in Federal estate tax of $199,260. [8] OPINION The first issue to be resolved in this case is whether the value of the life insurance policies on decedent's life is included in the gross estate under section 2035. Section 2035 [9] provides that the "gross estate *45 shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, during the 3-year period ending on the date of decedent's death." [10] The Ninth Circuit has held that a section 2035 transfer of life insurance policies occurs where life insurance policies are procured at the instance of the deceased within the presumptive period [11] *46 and the premiums on the policies are paid either directly or indirectly by the deceased. First National Bank of Oregon v. United States,488 F.2d 575, 576 (9th Cir. 1973). See also Hope v. United States,691 F.2d 786 (5th Cir. 1982); Detroit Bank & Trust Co. v. United States,467 F.2d 964 (6th Cir. 1972); and Bel v. United States,452 F.2d 683 (5th Cir. 1971). We first consider whether the initial premiums were paid by the decedent. Both of the initial premium payments were made with checks drawn by decedent on the Crocker account. The Crocker account was the only personal checking account maintained by the Schnacks, jointly or separately. The written agreement between them and Crocker clearly indicates that the account was to be owned by them as joint tenants, with rights of survivorship. Since the nature of a party's legal interest in property is a matter of state law, Aguilino v. United States,363 U.S. 509, 512-513 (1960), we will look to state law to determine if this agreement is sufficient to make the Schnacks joint tenants with rights of survivorship in the Crocker account.Under California law, in the absence of a contrary intent, this written agreement is sufficient to show that the account is property held in joint tenancy. See Paterson v. Comastri,39 Cal. 2d 66, 244 P.2d 902 (1952). [12] There is no evidence in the record indicating a contrary intent. Accordingly, we hold that the Schnacks owned the Crocker account as joint tenants with rights of survivorship. During *47 their lifetimes, Crocker could discharge its liability to both of them by payment of all of the money to or to the order of either of them. Cal. Fin. Code sec. 852 (West 1968). [13] After the death of either Schnack, Crocker could discharge its liability by paying all of the money in the account to or to the order of the survivor. Cal. Fin. Code sec. 852 (West 1968). [14]
A checking account with characteristics nearly identical to these was the subject matter of our recent opinion in Estate of Clay v. Commissioner,86 T.C. 1266 (1985). [15] There we held that for purposes of a section 2035 transfer of insurance policies, the physical act of making payment was more significant than the percentage of ownership in the underlying funds in the account from which the payment was made. Estate of Clay v. Commissioner,supra at 1273. Since the surviving spouse *48 of the deceased had managed the checking account and had drawn the checks in Estate of Clay, we there held that section 2035 was not applicable because the deceased had not paid the premiums. In the context of our analysis that nothing in the applicable State law required a contrary conclusion, we stated: [The surviving spouse] managed the bank account with the concurrence of the decedent. The withdrawal of funds with decedent's knowledge and consent constituted a transfer of those funds by decedent to [the surviving spouse], terminating [the deceased's] interest therein. Therefore, under the circumstances of this case, we *** hold that, in the absence of an agency relationship, the mere payment of premiums with funds withdrawn from a joint account does not constitute payment by the non-withdrawing tenant. [Footnote reference omitted.] Estate of Clay v. Commissioner,supra at 1274. Here it was the decedent, and not the surviving spouse, that managed the checking account and drew the checks *49 for payment of the initial premiums. Petitioner argues that decedent was acting as Dr. Schnack's agent in drawing the checks for the initial premium payments. The initial premium payments were made by checks drawn on the Crocker account. Dr. Schnack did not have a separate checking account and the Crocker account was his only personal checking account. Decedent managed the Crocker account and wrote nearly every check that was written on that account. When Dr. Schnack desired a particular check to be drawn, he would usually communicate the particulars to decedent, and decedent would draw a check on the Crocker account accordingly. [16] Since he did not have a separate checking account and since decedent was in charge of writing the checks on the Crocker account, he instructed decedent to and decedent agreed to draw and deliver the checks for the initial premium payments. In Estate of Clay,supra, we held with respect to the payment of premiums that there was no agency relationship between the manager of the checking account and the non-withdrawing tenant. There, however, the facts did not indicate, as they do here, that the payments were made at the direction of the non-withdrawing *50 tenant. Further, Dr. Schnack, unlike the non-withdrawing tenant in Estate of Clay, procured the policies here in issue. In March of 1979, he informed the agents that he was ready to purchase the first policy on decedent's life. Some time in June of 1979, he agreed to purchase the second policy on decedent's life. Particularly relevant here is that the agents never communicated with decedent with respect to the second policy. On these facts, we hold that decedent was acting as Dr. Schnack's agent when she drew and delivered the checks for the initial premium payments and that Dr. Schnack paid the premiums through decedent, his agent for payment of the premiums. As such, the funds were transferred by decedent to Dr. Schnack. Estate of Clay v. Commissioner,supra at 1274. Decedent's ownership interest in the funds was terminated and Dr. Schnack became the sole owner of the funds. Since the decedent did not pay the premiums in her individual capacity, she did not transfer the policies within the meaning of section 2035. Estate of Clay,supra.[17] We hold that section 2035 does *51 not apply. The second issue we must decide is whether, under section 2042, the gross estate includes the value of the proceeds receivable from the life insurance policies on decedent's life. Unless the beneficiary of the policies is the deceased's estate or its executor, in his capacity as executor, [18] inclusion turns on whether the deceased possessed at the time of death any incidents of ownership in the policies. Respondent argues that *52 since the policies were community property, decedent retained incidents of ownership in the policies by virtue of state law. Though respondent's reasoning is correct, see sec. 20.2042-1(c)(5), Estate Tax Regs., [19] his premise is incorrect. Under California State law, property acquired during the marriage is presumed to be community property. Cal. Civ. Code sec. 5110 (West Supp. 1986). However, where the property is acquired with the separate funds of one of the spouses, the presumption is rebutted and the property is treated as the separate property of the spouse whose separate funds were used in the acquisition. Estate of Murphy,15 Cal. 3d 907, 126 Ca. Rptr. 820, 828, 544 P.2d 956 (1976); Tyre v. Aetna Life Insurance Co.,54 Cal. 2d 399, 6 Cal. Rptr. 13, 353 P.2d 725 (1960); In re Marriage of Marsden,130 Cal. App. 3d 426, 181 Cal. Rptr. 910, 918 (1982); and Patterson v. Patterson,242 Cal. App. 2d 333, 51 Cal. Rptr. 339, 345 (1966). Since we have already held that the funds used to pay the premiums on the policies were transferred by decedent to Dr. Schnack, it follows that, under California State law, the policies are the separate property of Dr. Schnack and are not community *53 property. [20] We so hold. [21] Since respondent's premise, i.e., that the policies are community property, is incorrect, his argument is not here applicable. Respondent offered no *54 other argument to support his contention that section 2042 is here applicable. Accordingly, we hold that section 2042 does not apply to include the proceeds receivable from the life insurance policies in petitioner's gross estate. [22]
Decision will be entered for the petitioner.
Footnotes
1. The Release provided (1) that the policy to which the Release relates is the separate property of the spouse of the signer of the Release, (2) that, if any premiums have already been paid out of community funds, the signer releases any rights to the policy or its proceeds, (3) that future premiums may be paid out of community funds and, to the extent so paid, the signer transfers her interest in such funds to the spouse of the signer, and (4) the consideration for the execution of the Release is the signer's natural love and affection for the signer's spouse.↩
2. Our references to the first application are to it as amended.↩
3. Our references to "initial premiums" are to the first premium of the first policy and the first premium of the second policy. ↩
4. The check-o-matic arrangement authorized New York Life to draw checks on the Crocker account payable to New York Life. Though a check-o-matic arrangement was authorized for both policies, decedent died prior to the due date of the second premium with respect to the second policy. Thus, payments were made under the check-o-matic arrangement only with respect to the first policy.↩
5. Dr. Schnack did not open a separate account from which to pay the premiums on the life insurance policies on decedent's life because, in his own words, "[i]f I'd had a separate checking account, [decedent] would have still written the checks and signed them. So, I saw no reason to set up a separate account [to pay the premiums]."↩
6. Dr. Schnack's suit was pending as of the time of the trial of this matter and the parties have not since informed us as to whether it has been resolved.↩
7. Respondent determined the $425,000 value of decedent's interest in the two policies in the following manner. The first policy was valued at $500,000.The second policy was valued at $350,000, $200,000 of which was attributable to the portion of the policy New York Life has already paid and the remaining $150,000 of which was attributable to Dr. Schnack's $300,000 state law claim against New York Life. Thus, respondent valued the policies at $850,000. Respondent further determined that the policies were community property and that decedent had a one-half interest in the policies. 8. Much of the trial testimony and several of the exhibits were devoted to establishing that decedent and Dr. Schnack were living separate and apart. This fact, if established, may have been relevant to an argument that we do not reach. Since we do not reach this argument, we do not find it necessary to determine that decedent and dr. Schnack were not living separate and apart. Further, there is a question as to whether decedent was a resident of California or Nevada. Since the result reached under either state's applicable law is the same, we do not find it necessary to determine in which state decedent was a resident. Where necessary, we will refer to California State law and note Nevada State law.↩
9. All section references are to the Internal Revenue Code of 1954, as amended and in effect at the time of decedent's death, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
10. Sec. 2035(b) provides two exceptions to sec. 2035(a), neither of which is here applicable.↩
11. The "presumptive period" referred to by the Ninth Circuit in First National Bank of Oregon v. United States,488 F.2d 575, 576 (9th Cir. 1973), is the three-year period ending before decedent's death.
12. See also Sly v. Barnett,97 Nev. 587, 637 P.2d 527 (1981) (citing Paterson v. Comastri,39 Cal. 2d 66, 244 P.2d 902↩ (1952)). 13. See alo Nev. Rev. Stat. sec. 100.085 (Michie 1986). This statute was enacted in 1977. 1977 Nev. Stat. p. 805. Its predecessor, Nev. Rev. Stat. sec. 663.015↩ (1975), was substantially similar. 14. See note 13, supra.↩
15. Estate of Clay v. Commissioner,86 T.C. 1266 (1986), was rendered after the briefs in this case were filed.Neither party has attempted to brief the Court on Estate of Clay's↩ effect on this case.
16. This procedure would have been followed even if Dr. Schnack had had a separate account. See note 5, supra.↩
17. The remainder of the premium payments were clearly not made by decedent. These payments were made by checks drawn on the Crocker account by New York Life pursuant to authorization granted by Dr. Schnack. We therefore leave for another day the issue of whether only the initial premium payment is relevant in determining if a transfer of an insurance policy occurs for purposes of section 2035.↩
18. See United States v. First Nat. Bank & Trust Co. of Minneapolis,133 F.2d 886↩ (8th Cir. 1943). Dr. Schnack's status as beneficiary is independent of his status as executor of decedent's estate. Respondent has not argued inclusion in the gross estate of the proceed receivable from the policies based on Dr. Schnack's dual status as beneficiary and executor.
19. See Estate of Baratta-Lorton v. Commissioner,T.C. Memo. 1985-72↩. 20. See also Estate of Wilmot v. Commissioner,T.C. Memo. 1970-240↩. 21. The result reached under Nevada State law is the same, though the reasoning is different."In [Nevada], unless otherwise provided by law or decree, or agreement all property acquired after marriage is considered to be community property [Nev. Rev. Stat. sec. 123.220 (Michie 1986)], and that presumption can only be overcome by clear and convincing evidence." Peters v. Peters,92 Nev. 687, 557 P.2d 713, 715 (1976) (citations omitted). The title by which spouses hold property alone can be the clear and convincing evidence to overcome the community property presumption. Peters v. Peters,supra↩ at 715. That the policies list Dr. Schnack as applicant, beneficiary, and owner is sufficient to rebut the community property presumption. Consistent with the policies, we hold that, under Nevada State law, the policies were Dr. Schnack's separate property and were not community property.
22. We note that respondent has not argued, based on the possible "crossed" ownership of the policies on decedent's and Dr. Schnack's lives, that the value of the policies here in issue should be included in the gross estate pursuant to United States v. Estate of Grace,395 U.S. 316↩ (1969). Accordingly, we do not reach this issue. Further, since we have ruled in favor of petitioner on both issues presented, we need not address its argument that the Release exempted the policies from being included in the gross estate.