AMERICAN NATIONAL BANK AND TRUST COMPANY OF ROCKFORD, ILLINOIS, as executor of the Estate of Bruce F. Olson, deceased, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 87–1407.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 18, 1987.

Decided Nov. 2, 1987.

defense; thus, we need not decide which statute of limitations applied under the circumstances of this case.

David R. Hodgman, Schiff Hardin & Waite, Chicago, Ill., for plaintiff-appellant.

Robert A. Bernstein, Dept. of Justice, Washington, D.C., for defendant-appellee.

Before BAUER, Chief Judge, and CUMMINGS and POSNER, Circuit Judges.

POSNER, Circuit Judge.

This appeal presents a potentially recurrent question, though not one on which we have been able to find any reported decisions. Suppose a life insurance policy is assigned to the insured's spouse, and later the spouse relinquishes all rights under the policy as a condition of the insured's being allowed to obtain a bigger policy, and the new policy is not assigned. Can the spouse nevertheless be deemed the owner of the new policy, in whole or part, whether as a matter of contractual interpretation or by virtue of the rules relating to constructive trusts or to resulting trusts, and thereby keep the proceeds of the new policy out of the estate of the insured for federal estate tax purposes?

In 1975 Bruce Olson, a 58–year–old executive, insured his life under a group policy that the Montgomery Ward Life Insurance Company had issued to his employer. A year later Olson assigned the policy to his wife. The assignment (which the employer referred to as an "absolute assignment") stated:

> For love and affection and no other valuable consideration, the assignor hereby absolutely and forever assigns and transfer[s] to the assignee ownership of the insurance on the life of the Insured provided under the captioned group life policy and evidenced by the captioned certificate, together with all proceeds thereof and benefits, claims, and advantages whatsoever, now due or hereafter to arise or to be had or made by virtue thereof.... The assignment includes all additional insurance, if any, that may be provided in the future under said group

life insurance evidenced by said certificate.

In 1978 Olson's employer obtained another group life policy, this one from Standard of America, which offered substantially more insurance for the select group of employees, including Olson, who were eligible for it. Concretely, it offered Olson $1.5 million versus $600,000 under the Montgomery Ward policy. Although eligibility was not limited to employees insured under the Montgomery Ward policy (the estate misstates the record in arguing that it was), to enroll under the new policy any employee who was insured under the old one—plus the policy owner, if the insured had assigned the policy to another person, as Mr. Olson had done—had to cancel coverage under the old policy by signing an election form. The form made clear that the new policy was indeed new, and not merely a continuation of the old:

> The new Executive Life Insurance Program [the Standard of America policy] will be includable in the employee's gross taxable estate under Federal Statute and regulation. An absolute assignment of this new Executive Life Insurance Program will be required to begin the process of removing these insurance proceeds from the employee's taxable estate, and the 3 year waiting period will commence with the date of this new assignment.

The reference to a "3 year waiting period" was an allusion to 26 U.S.C. § 2035(a), which provides that property transferred by a decedent three or fewer years before his death (including a life insurance policy owned by him) remains a part of his estate for purposes of federal estate tax. See Bittker, Federal Taxation of Income, Estates and Gifts ¶ 127.8 (1984).

Since participation in the new program was optional, Olson and his wife could have continued under the Montgomery Ward policy. Indeed, the form from which we have quoted said that "employees whose health may not permit a renewal of the 3–year waiting [period] should consider this new 3–year waiting period [running from the date of an absolute assignment of the

new policy] in making their decision." But Olson and his wife went ahead and signed the election form. Four months later he was dead. Although he had not assigned the new policy to Mrs. Olson (or anyone else, for that matter), she was the beneficiary, and Standard of America duly paid her the $1.5 million insurance proceeds. The Olson estate did not include this money in its estate tax return, and the Internal Revenue Service assessed a deficiency. The estate paid it, then brought this suit for a refund. The parties filed cross-motions for summary judgment, the district court entered judgment for the government, and the estate appeals.

■ The estate argues that the Standard of America policy was one of the "benefits, claims, and advantages whatsoever, now due or hereafter to arise or to be had or made by virtue" of the Montgomery Ward policy, and hence was assigned to Mrs. Olson as part of the "absolute assignment" of that policy three years and 13 days before Mr. Olson died. (Had the assignment occurred 13 days later, it would not have removed any proceeds covered by the assignment from Olson's estate.) We disagree. The policy issued by Standard of America was not a dividend, proceed, or other fruit of the policy Montgomery Ward had issued. It was a different policy offered by a different insurance company. More important, it was not conditioned on the employee's having been insured under the Montgomery Ward policy, and hence in no sense was it an advantage "due or hereafter to arise or to be had or made by virtue of" that policy. Most important, it was available to the Olsons only on condition that they terminated the earlier policy and thereby extinguished all the rights that Mrs. Olson had under it. She gave up the policy, fruits and all, for good consideration, namely the expectation—which was realized, and shortly too—that she would obtain a greater death benefit under the new policy. That benefit was greater even after payment of the estate tax on the proceeds of the second policy.

The estate is right to stress the all-inclusive character of the language used to con-

vey the fruits of the Montgomery Ward policy to the assignee. But since the Standard of America policy was available to employees not enrolled under the Montgomery Ward policy, was conditioned on the extinguishing of all rights arising under that policy, and hence was intended to be an alternative rather than a dividend or add-on to it, we do not see how the Standard of America policy could be thought a benefit or advantage arising from the earlier policy. The proceeds of the new policy, therefore, did not pass to Mrs. Olson by virtue of the original assignment. Mr. Olson was the owner of the new policy, and since it was never assigned it was still his property on the day he died.

▮▮ The estate makes an alternative argument, that Mrs. Olson was the beneficial owner of a resulting trust in the new policy. The trust is said to have come into being when she relinquished her rights under the old policy and her husband enrolled under the new one, and to be measured by the proceeds that she would have received under the old policy; she argues that those proceeds, at least, should be excluded from the taxable estate. It might seem that this argument, even if sound, could not help her, because the events alleged to have created the resulting trust occurred only four months before Mr. Olson's death and thus well within the period in which transfers are ineffectual to divest the transferor of ownership for purposes of federal estate tax. However, if there was a resulting trust this means that Mr. Olson never transferred the ownership of the part of the new policy impressed by the trust—she owned that part right from the start. But there was no resulting trust under Illinois law, which the parties agree governs the question.

A resulting trust must be distinguished from a constructive trust, the latter being a device for preventing unjust enrichment. Its effect is to require a person who has acquired property by fraud or other inequitable conduct to convey it to the true owner. See, e.g., *People ex rel. Hartigan v. Candy Club*, 149 Ill.App.3d 498, 502, 103 Ill.Dec. 167, 170, 501 N.E.2d 188, 191 (1986). If Mrs. Olson had paid for the assignment of the Montgomery Ward policy, and her husband duped her into surrendering the policy by a promise that he later broke to name her as the beneficiary, there would be an argument (how good a one we need not decide) for impressing a constructive trust on the proceeds of the new policy up to the value of the old (all she had been cheated out of). But Mrs. Olson put up not a cent for the original assignment—the only purpose of which, as the estate readily concedes, was to avoid federal estate tax on the proceeds of the policy. Nor did her husband fail to make her the beneficiary of the second policy. There was no inequity in his conduct at any stage, and hence no basis for imposing a constructive trust on the proceeds of the second policy. Anyway the estate is not arguing for a constructive trust, although, as we shall see later, it uses constructive-trust principles indirectly.

A resulting trust, unlike a constructive trust, seeks to carry out a donative intention rather than to thwart a wicked scheme. See generally *Gary-Wheaton Bank v. Meyer*, 130 Ill.App.3d 87, 91–92, 85 Ill.Dec. 180, 183–84, 473 N.E.2d 548, 551–52 (1984); *Estate v. Wilkening*, 109 Ill.App.3d 934, 943, 65 Ill.Dec. 366, 371, 441 N.E.2d 158, 164 (1982). The typical case is where one person supplies the money to buy something but title is placed in another person's name; the question is then whether the nominal purchaser intended the actual payor to have an ownership interest in the good. See, e.g., *In re Estate of Wilson*, 81 Ill.2d 349, 355–56, 43 Ill.Dec. 23, 26–27, 410 N.E.2d 23, 26–27 (1980); *In re Estate of McGee*, 66 Ill.App.3d 994, 998, 23 Ill.Dec. 141, 144, 383 N.E.2d 1012, 1015 (1978). Ordinarily the person claiming a resulting trust must establish the existence of the trust by clear and convincing evidence. *In re Estate of Wilson, supra*, 81 Ill.2d at 356, 43 Ill.Dec. at 27, 410 N.E.2d at 27. (The reason is the danger of fraudulent claims of resulting trusts, a danger that has led several states, though not Illinois, to abolish purchase-money resulting trusts. See 5 Scott on Trusts § 440.2 (3d ed. 1967).) But where the claimant supplied the consideration for the purchase,

the probabilities shift and a rebuttable presumption of a resulting trust arises. *In re Estate of Wilson, supra,* 81 Ill.2d at 356, 43 Ill.Dec. at 27, 410 N.E.2d at 27. Unless she can invoke this presumption Mrs. Olson cannot possibly prove a resulting trust.

Although Mrs. Olson contributed nothing to the cost of the Standard of America policy, her consent to relinquish her rights under the old policy was essential to Mr. Olson's enrolling under the new one. That consent was not costless to her; she gave up something of value; and the incurring of a detriment is a perfectly valid, utterly traditional form of consideration. Though we know of no case where this form of consideration has been used to create the presumption of a resulting trust, we are not impressed by the suggestion in 2 Bogert & Bogert, Law of Trusts and Trustees § 455, at pp. 660–61 (rev. 2d ed. 1977)—for which no reason is given—that the consideration which triggers the presumption must be a contribution to the purchase price of the property in which the resulting trust is claimed. The only purpose of requiring consideration in the resulting-trust setting is evidentiary. Since people usually don't give up something of value without expecting something in return, an inference that the purchaser meant another person to own the thing purchased arises when the other person paid all or part of the purchase price or, what is the same thing (as it seems to us), incurred a substantial cost necessary to make the purchase go through.

The presumption has less force in dealings within the family, where altruism rather than exchange is the life blood of transactions, than between strangers. So one is not surprised that the Illinois courts hold that "Where a man pays for land and causes it to be conveyed to his wife or child the presumption is that it was intended as a gift or advancement." *In re Estate of Jarodsky,* 122 Ill.App.2d 243, 247, 258 N.E.2d 365, 368 (1970). This is another way of saying that the presumption of a resulting trust (which would be in favor of the man, as the payor) does not arise in such a case—is in fact reversed. If the same approach were followed in a case where the wife was the source of money or other consideration used to bring about a conveyance of property to her husband, the estate's claim in this case would be totally defeated. But the Illinois courts make an exception for the case where the wife rather than the husband is the payor. See *id.*

In an era when laws that differentiate between men and women on grounds thought to stereotype women as the weaker sex are constitutionally suspect, see, e.g., *Orr v. Orr,* 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979), this exception, questioned more than half a century ago, see Comment, 16 Ill.L.Rev. 530 (1922), and rejected recently by the supreme court of another state, see *Mims v. Mims,* 305 N.C. 41, 286 S.E.2d 779 (1982), must be reckoned to be highly dubious. But we need not decide the current validity of the exception under either the U.S. Constitution or the common law of Illinois to decide the present case. Even if valid and applicable the exception cannot carry the day for the estate, because it has been rebutted. So the district court found, at any rate, and its finding, not being clearly erroneous, binds us. True, the proper function of a summary judgment proceeding is not to find the facts but merely to decide whether there is a triable issue of fact; and the ultimate issue in a resulting-trust case, that of donor's intent, is indeed factual. Nor does the filing of a motion for summary judgment waive the movant's right to a trial if the motion is denied. *May v. Evansville-Vanderburgh School Corp.,* 787 F.2d 1105, 1115 (7th Cir.1986). But in this case, as in *May,* the parties do not want a trial. They treat the district court's decision as if it were the findings and conclusions in a bench trial. Rather than ask us to order a trial on the issue whether a resulting trust was created, the estate asks us to rule that it was created. The parties have consented, we conclude, to trial on the documents submitted in the summary judgment proceeding, see *id.* at 1115–16, thus making the clearly-erroneous standard the proper one after all.

The critical fact that rebuts the presumption of a resulting trust is the language of

the election form that both Olsons signed. It makes clear that the assignee of the previous policy does not obtain ownership of the new merely by virtue of surrendering his (in this case her) rights under the old policy. A new assignment is necessary. The Olsons' signatures on an election form that emphasized the need for a new assignment make it hard to believe that they understood or that Mr. Olson intended that the new policy would be Mrs. Olson's property in the absence of a fresh assignment. An additional point is that Mrs. Olson was compensated for relinquishing her rights under the old policy, simply by the prospect of obtaining much larger proceeds under the new policy. That prospect would be defeated only if Mr. Olson changed the beneficiary under the new policy (as he could not have done under the old), and there is no evidence that he ever contemplated doing such a thing or that his wife feared he might. Remember, too, that the original assignment had not been motivated by a desire to give Mrs. Olson a more definite benefit than she would have enjoyed as the beneficiary of an insurance policy whose beneficiary Mr. Olson could change at will, but merely to reduce estate tax. If, when the new policy was offered, Mr. Olson did not expect to live three more years—a possible though hardly compelling inference from his failure to assign the new policy promptly and from his death just a few months after he elected the new policy—he would have had no tax incentive for assigning the new policy, or any other incentive that we can think of.

The estate has one more string to its bow. It argues that assuming that the principles of constructive trusts would have barred Mr. Olson from trying to change the beneficiary under the second policy, he never obtained beneficial (as distinct from bare legal) ownership of that policy. Notice that the argument is not that there *was* a constructive trust, but that one would have sprung up if he had changed the beneficiary, and therefore it is as if he obtained coverage under the second policy purely as a trustee for Mrs. Olson, the beneficial owner. And if he was a bare trustee, maybe he perforce relinquished all "inci-

dents of ownership," cf. *Estate of Piggott v. Commissioner*, 340 F.2d 829, 835 (6th Cir.1965), although if he retained any such incidents, then 26 U.S.C. § 2042(2) would force the proceeds of the policy into his estate for federal estate tax purposes even if he was not the owner. See generally *Estate of Clay v. Commissioner*, 86 T.C. 1266 (1986).

We shall not have to decide whether the sort of trustee that the estate envisages would retain any incidents of ownership in the statutory sense; for we disagree with the estate's premise, which is that Mr. Olson could not have changed the beneficiary of the Standard of America policy. As noted earlier, especially since Mrs. Olson paid nothing for the assignment of the first policy no principle of constructive trusts would have precluded Mr. Olson from changing the beneficiary of the second unless he had induced his wife to surrender the first by a promise to make her the beneficiary of the second, and there is no evidence of such a promise.

Affirmed.