**ESTATE of Joan SCHNACK, deceased, and William D. Schnack, Executor, Petitioners–Appellees,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellant.**

No. 87–7169.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 10, 1988.

Decided May 25, 1988.

Barbara I. Hodges, Tax Div., U.S. Dept. of Justice, Washington, D.C., for respondent-appellant.

Lawrence A. Nestel, San Francisco, Cal., for petitioners-appellees.

Before WRIGHT and CHOY, Senior Circuit Judges, and NELSON, Circuit Judge.

NELSON, Circuit Judge:

## FACTUAL AND PROCEDURAL BACKGROUND

The crux of this controversy involves whether decedent exercised control over the purchase of life insurance sufficient to trigger the application of 26 U.S.C. § 2035(a).[1] Joan Schnack lived in Sparks, Nevada where she managed the Schnacks' co-owned businesses, and William Schnack lived in Weeds, California where he maintained a medical practice. Joan and William maintained one bank account, a joint checking account with rights of survivorship in Yreka, California. The bank account was funded with earnings from both partners and with income from jointly owned assets. Although the Schnacks experienced marital difficulties and primarily lived apart, Joan managed their personal finances and wrote most of the checks.

In 1978, insurance agents contacted the Schnacks about their insurance needs. William Schnack was initially not interested in obtaining life insurance. The agents continued to contact Joan, and received permission from her to obtain financial information from the Schnacks' accountant. On November 10, 1978, the agents met with Joan and William and advised them that in the event of death their estates would face severe liquidity problems. The agents also told them that, for estate tax purposes, life insurance policies should be held by someone other than the insured. Joan and William each applied for $500,000 worth of life insurance at this meeting. On the initial application Joan named her own estate as the beneficiary of her policy and she did not designate anyone as the owner of the policy.

For estate tax purposes, the agents advised the Schnacks to pay the premiums on Joan's policy with separate funds out of a separate bank account. The agents further suggested that Joan sign a release[2] of her interests in the insurance policy. While the policies were purchased at the same time, the separate ownership structure and advice only applied to the policy on Joan's life because William's pension plan owned and paid for his policy.

In December, William phoned the agents and deferred purchase of the policies. In March of 1979, William again phoned the agents to tell them that Joan and he were ready to buy. The agents met separately with Joan and William to complete the remaining paperwork in order to issue the policies. Joan amended her initial application, naming William as owner and beneficiary. When the policy was issued, New York Life Insurance Company required the Schnacks to execute another application. On this application, William signed as applicant.

The Schnacks did not open a separate account containing only William's money to pay the premiums on Joan's policy. The initial premium on the policy was paid with a check drawn by Joan on the joint check-

---

1. Section 2035 was amended significantly both in 1976 and in 1981. The pre–1976 provisions required inclusion of transfers made "in contemplation of death." Congress, concerned with the amount of litigation over the question of intent, amended the statute in 1976 to include a mandatory rule that all transfers made within three years are includable. *See Hutchinson v. Commissioner,* 765 F.2d 665, 669 (7th Cir.1985); H.R.Rep. No. 1380, 94th Cong., 2d Sess. 12 (1976), U.S.Code Cong. & Admin.News 1976, pp. 2897, 3366. This case concerns the statute as in effect from 1977 to 1982.

In 1981 Congress effectively repealed this provision, with certain exceptions not relevant here, by inserting subsection (d) to read: "subsection (a) shall not apply to the estate of a decedent dying after December 31, 1981." *See* 26 U.S.C. § 2035(d) (Supp.1987). The new subsection (d) is not applicable in this case because decedent died on August 9, 1979.

2. The release provided that (1) the policy to which the release relates is the separate property of the spouse of the signer of the release, (2) if any premiums have already been paid out of community funds, the signer releases any rights to the policy or its proceeds, (3) future premiums may be paid out of community funds and, to the extent so paid, the signer transfers her interest in such funds to the spouse of the signer, and (4) the consideration for the execution of the release is the signer's natural love and affection for the signer's spouse.

ing account. Subsequent premiums were to be paid automatically from the joint account.

In June of 1979, William called the agents about the Schnacks' insurance needs. The Internal Revenue Service Commissioner ("Commissioner") contends that the record shows that William first sent the agents a letter requesting increased coverage on his life. The agents suggested that the coverage be increased on both Joan and William. The Schnacks increased the coverage on Joan's life with another $500,000 policy. The initial premium was paid by a check drawn by Joan on the joint checking account, with automatic payment provisions for subsequent premium payments. This policy was approved and issued by the insurer, and was mailed on August 9, 1979, the date of Joan's death. William was again listed as policy applicant, owner, and beneficiary.

The federal estate tax return for Joan's estate did not include any portion of the life insurance policies' proceeds. The Commissioner determined that one half of the proceeds of each policy on Joan's life were includable in decedent's gross estate and issued a notice of deficiency to the estate.[3] The estate petitioned the Tax Court for a redetermination of the deficiency.

The Tax Court relied on *Estate of Clay v. Commissioner*, 86 T.C. 1266 (1986), to hold that no transfer occurred under § 2035. The Tax Court determined that Joan paid premiums merely as William's agent. Although the court found that the checking account was held in joint tenancy with rights of survivorship, the Tax Court concluded that the insurance proceeds were not includable under 26 U.S.C. § 2042 (1979). The Commissioner does not appeal this aspect of the Tax Court's ruling. The Commissioner timely appealed the Tax Court's decision, pursuant to 26 U.S.C. § 7483.

## ISSUE PRESENTED

Did the Tax Court err in holding that life insurance proceeds were not includable in decedent's gross estate under § 2035 where decedent's spouse owned the policy but decedent wrote premium checks on a joint bank account and participated in insurance sales and estate tax planning meetings?

## DISCUSSION

### A. *Standard of Review.*

 This court reviews facts found by the Tax Court for clear error. *Vukasovich, Inc. v. Commissioner*, 790 F.2d 1409, 1411 (9th Cir.1986). In the past there has been confusion over the scope of review of Tax Court decisions on questions of law. See *Vukasovich*, 790 F.2d at 1411–13 for a discussion and history of the conflicting caselaw in this circuit. While deference to the Tax Court's expertise on narrow technical issues may be appropriate in some cases, we review questions of law de novo. *Id.* at 1413.

### B. *The 'First National' Definition of Transfer.*

This case concerns the continuing vitality of *First National Bank of Oregon v. United States*, 488 F.2d 575 (9th Cir.1973). In *First National*, we construed the meaning of the word 'transfer' in § 2035 to encompass life insurance transactions that are structured to avoid estate taxes. *Id.* at 577. Section 2035 has been amended since the *First National* decision and several Tax Court cases have interpreted that opinion in cases with facts similar to the present case. A review of these holdings is necessary to determine whether the ownership structure of the life insurance purchase at issue falls under the definition of transfer as originally stated in *First National*.

Section 2035, at the time of Joan's death, required in relevant part that "the value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any

---

**3.** Because of an underlying, unsettled dispute between William and the insurer, William did not receive the full policy amount. The Com- missioner has valued the deficiency at $199,260. The method of determination has not been challenged by the appellees and is not at issue here.

time made a transfer, by trust or otherwise, during the 3–year period ending on the date of the decedent's death." 26 U.S.C. § 2035(a) (1979). This section contained an exemption for nominal gifts under $3,000, but explicitly excluded transfers with respect to life insurance policies. § 2035(b)(2). Appellee does not claim that this exception operates to preclude inclusion of the insurance proceeds in this case. Application of § 2035 to the facts of this case raises two issues: (1) did Joan possess any property interest to transfer, and (2) did Joan transfer a property interest to William within three years of her death?

In *First National* we held that "[t]here is only a formal difference between a decedent first buying a policy, then transferring it to the beneficiary, and the beneficiary purchasing the policy at the urging of the decedent and with the decedent's funds." *First National*, 488 F.2d at 577. Appellee argues that since Joan never owned the policies, she could not have transferred an interest in them, and that she explicitly renounced an interest in the money that was subsequently used to obtain the policies. Therefore, appellee urges this court to uphold the Tax Court's determination that no transfer occurred because William purchased the policies with his separate funds.

When the decedent is the initiator of the insurance as "part of an integrated transaction arranged and regulated by the decedent," *Estate of Kurihara v. Commissioner*, 82 T.C. 51, 63 (1984) (Whitaker, J., concurring), the proceeds of the insurance policies are includable in the gross estate. *First National* settled the issue that the property interest conferred consists of the proceeds of the policies and not merely the premiums paid to date. *First National*, 488 F.2d at 576 (insurance policy proceeds includable in gross estate where wife applied for policies at husband's urging and was the owner and beneficiary of the policies, but the husband-decedent paid the policy premiums). *See also In re Estate of Silverman*, 521 F.2d 574 (2d Cir.1975). Thus, the issue involves whether Joan exercised sufficient control over the purchase

and retention of the policies or whether her property was used to purchase the policies such that the technical form of ownership can be overlooked and the court can determine that the substance of the transaction constituted a transfer.

The purpose of § 2035 provides useful insights into whether the indicia of control present in this case should translate into includable insurance policy proceeds. This court noted that an unduly technical interpretation of the word 'transfer' in § 2035 undermines the statutory goal of the legislation. Section 2035 was enacted "'to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax.'" *First National*, 488 F.2d at 577 (quoting *United States v. Wells*, 283 U.S. 102, 117, 51 S.Ct. 446, 451, 75 L.Ed. 867 (1931); *see also Hope v. United States*, 691 F.2d 786, 790 (5th Cir.1982). Thus, this court held that supporting formalistic ownership distinctions which taxpayers create for estate planning purposes serves no policy "except one of tax evasion." *First National*, 488 F.2d at 577. *See also Bel v. United States*, 452 F.2d 683 (5th Cir.1971), *cert. denied*, 406 U.S. 919, 92 S.Ct. 1770, 32 L.Ed.2d 118 (1972); *Detroit National Bank & Trust Co. v. United States*, 467 F.2d 964 (6th Cir.1972), *cert. denied*, 410 U.S. 929, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973).

The underlying purpose of the statute at issue here has not been changed by amendment. In 1976, Congress amended the statute to make it easier to determine that a transfer occurred, thereby enhancing the tax enforcement tool provided by the statute. In 1981, however, Congress eliminated this transfer tax for decedents dying after 1981. *See* The Economic Recovery Tax Act of 1981, Pub.L. 97–34, Title IV, §§ 403(b)(2)(B), 424(a); 95 Stat. 301, 317 (1981). This amendment does not alter the arguments supporting the enactment or application of tax provisions in force at the time of decedent's death.

C. *Tax Court Interpretations of the 'Transfer' Standard.*

The Tax Court recently applied the reasoning of *First National* to four cases.

The taxpayer in *Kurihara,* 82 T.C. at 52, created an irrevocable trust for his wife and children. Kurihara assigned all of his interests in a life insurance policy application to the trust. *Id.* The trustees applied for the policy and were named as beneficiaries and owners. Kurihara signed the policy only as the insured. The policy terms specified that the policy did not take effect until the first full premium had been paid. *Id.* The trust documents stated that the trustees were under no obligation to pay insurance policy premiums or to notify anyone of any nonpayment of premiums. The trustees would not be liable if they did not pay the premiums. *Id.* at 53 n. 3. Kurihara wrote a check to the trustee in the amount of the annual insurance policy premium. The check included the notation —"premium for Life Ins. No. 10010395 Columbian Mutual Life"—the policy number and company of Kurihara's policy. *Id.* at 52.

Even though a separate trust had been structured to retain ownership of the policy and the premiums were paid by the trust, the Tax Court looked beyond the structure of the ownership arrangement to analyze the substance of the transaction. The court relied on the fact that Kurihara's money was used to pay the premium and that but for Kurihara's money, the policy would never have been purchased. Kurihara's involvement meant that the trustees did not act " 'entirely on their own volition.' " *Id.* at 61 (quoting *Estate of Coleman,* 52 T.C. 921, 923 (1969)). Therefore, the Tax Court reasoned that by paying the initial premium, the decedent created ownership rights in the policy and transferred those rights to the trustees. *Id.*

Under the reasoning of *Kurihara,* the proceeds from the policy on Joan's life should be includable in her gross estate. Even though the Schnacks took steps to structure separate ownership of the policies, those steps were neither complete nor sufficient. William did not act entirely of his own volition, either in obtaining the policies or in making the payments.

Joan attended the meetings with the insurance agents; she was clearly interested in a mutual insurance purchase arrangement; such a purchase actually occurred; Joan took responsibility for making premium payments; the payments were drawn from a joint bank account; and no steps were taken to segregate William's funds into a separate fund from which to pay the insurance policy premiums. Moreover, the release specifically states that Joan transferred her rights in the community funds to the extent that the money is used as policy payments. As in *Kurihara,* William was not free to claim a sole property right to the community funds to be used for whatever purpose he chose—he was only given a sole interest in those funds to the extent that they were used to purchase insurance on Joan's life. Here, the lack of choice and explicit transfer of funds for the given purpose of purchasing insurance parallels the factors relied upon in *Kurihara,* 82 T.C. at 60–61. Thus, under *Kurihara,* the insurance policy proceeds were includable pursuant to § 2035.

Similarly, in *Estate of Mary Barratta–Lorton,* T.C. Memo 1985–72 [¶ 85,072 P–H Memo T.C.] (1985) the court looked not to the ownership of the policy, but instead to the nature of the premiums paid. The court found that the husband in *Barratta–Lorton* separately owned the policy based on an enforceable oral agreement between the spouses. *Id.* at 343–344. Here, too, the Tax Court determined that William owned the policy as separate property. Nonetheless, the pivotal characteristic in *Barratta–Lorton* consisted not merely of ownership, but of the source of ownership of the funds used to pay the policy premiums. *Id.* The taxpayer's employer paid the policy premiums, and the court held that these payments were compensation. *Id.* at 345. The court further held that under California community property rules, the decedent paid one half of the premium because compensation is community property, notwithstanding the separate ownership agreement as to the policy. Therefore the decedent constructively transferred one half of the interest in the policy proceeds. *Id.*

Here, it is clear that the premiums were to be paid out of a joint bank account in California, a state where community property laws governed the ownership of the funds in that account. *See id.* Therefore, while Joan could have and did validly give her property rights in the premiums paid to William, the act of giving her one half interest in those funds constituted an act of transfer. Joan signed an agreement which released her interests in the money taken from the joint account at the point when the money was paid. The fact that future premiums were to be automatically paid from the joint account strengthens the argument that the payments should be treated as the equivalent of a transfer. The Tax Court never focused on the limited transfer of the funds for a specific purpose, the determinative action in *Barratta–Lorton,* and the action that should be the focus of the court's concern here.

The court below reached an internally inconsistent result based on its analysis of § 2035 and § 2042. For purposes of § 2035 analysis, the court insisted that the act of payment is insufficient evidence of instigation or control because Joan terminated her interest in the funds. She retained no interest in the money used to pay for the insurance. For purposes of § 2042, however, the court determined that Joan retained no incidents of policy ownership because she transferred her interest in the insurance premium money to William. Therefore, all of Joan's actions that support a theory of participation in the purchase were overlooked by the court below. Because the court determined that Joan acted only in an agency capacity when drawing insurance premium checks on the joint account, the court could then conclude that it was actually William, not Joan, who paid for the insurance. This analysis circumvents the parallel circumstances and contrary holding of *Kurihara,* which the court below did not discuss.

In *Estate of Hass v. Commissioner,* T.C. Memo 1986–64 [¶ 86,063 P–H Memo T.C.] (1986), by contrast, the Tax Court used reasoning consistent with the holdings of *Kurihara* and *First National* to inquire into the substance of the transaction, and in so doing, held the insurance policy proceeds includable in decedent's gross estate. The Tax Court noted that:

> [w]hether Nellie or [the decedent] signed the check drawing on the community account to pay the premium is immaterial.... The decedent had fully stated his desire and intent that the United policy be owned separately by Nellie, and it was separate property. When community funds were used to purchase that separate property, those funds were transferred to Nellie whether decedent or Nellie signed the check.

*Id.* at 243 n. 4. In *Hass* the decedent and spouse executed a supplemental provision to the policy stating their mutual intent that the policy was the sole and separate property of the spouse. In the present case Joan executed a release of her interests in the money used to pay the premiums on the policy. The specificity of the money transfer created the equivalent of an interest in the policy and its eventual proceeds. *See Kurihara,* 82 T.C. at 61; *First National,* 488 F.2d at 577.

Even if we assume that William was the sole actor and that he purchased a policy which constituted his separate property, the reasoning and result of *Hass* apply. The spouse "purchased separate property with community funds. The translation of community property into separate property involves a transfer by one spouse of his interest in those community funds to the other spouse." *Hass,* ¶ 86,063 at 242. In *Hass,* the Tax Court decided that the proceeds were includable to the extent that the decedent had a community property interest in the joint account. The court allocated the amount of includable proceeds by reviewing the bank account contributions made by each spouse and using the same percentage ratio for estate tax deficiency purposes. In this case, the Commissioner is relying on California community property laws to argue that 50% of the proceeds are includable regardless of the percentage of each participant's fund contributions. The court below interpreted the analysis used in *Estate of Clay v. Commissioner,* 86 T.C. 1266 (1986), as mandating a con-

trary result from that reached in the cases discussed above. A close reading of *Clay*, however shows that *Clay*'s synthesis of the criteria found important in *First National* and *Kurihara* is not inconsistent with a conclusion that the transaction was the equivalent of a transfer in this case.

### D. *Clay's Application to the Facts of this Case.*

The Tax Court in *Clay* rejected the kind of percentage-of-contribution-tracing analysis employed by the court in *Hass*. The court concluded, without discussing *Hass*, that using such a ratio to determine an estate tax deficiency was an unwarranted extension of *Kurihara*. *See Clay*, 86 T.C. at 1272.

When rejecting the tracing analysis, the court identified what it considered to be the proper focus when defining a transfer under § 2035. "The significance of the emphasis upon payment is not as to the source of the funds; rather, it is the act of making payment and the control of the entire transaction reflected in this act." *Id.* at 1273. The *Clay* decision does not discuss the seemingly contrary conclusions in *Hass*, ¶ 86,063 at 243 n. 4 and *Barratta–Lorton*, ¶ 85,072 at 344–45. The *Clay* court further states that:

> [w]here parties maintain joint bank accounts, each co-tenant is not necessarily the agent of the other co-tenant. Therefore, premium payments made with funds withdrawn from a joint account are not per se made by the nonwithdrawing co-tenant.

*Clay*, 86 T.C. at 1273. The Tax Court relied on this language to conclude that the source of funds for the premium payments in this case is irrelevant, because a transfer of Joan's interest in these funds occurred. The *Clay* decision can be interpreted in

several ways. Regardless of the way in which one views *Clay*, its result is not mandated in this case.

*Clay* can be interpreted as consistent with *Kurihara*, *Hass*, and *Barratta–Lorton*. *Clay* acknowledges that a payment by one co-tenant from a joint bank account is not per se attributable to the other co-tenant, 86 T.C. at 1273. This conclusion does not mean that under circumstances in which a decedent explicitly transfers her interests to a portion of those community funds when used for a specific purpose, such a payment of money from one spouse to the other cannot be held to be a transfer. *See Hass*, ¶ 86,063 at 240. The facts of this case more closely resemble the situation in *Hass* and *Kurihara* where a decedent directed that funds be transferred to the other spouse for the purpose of life insurance purchases. This kind of explicit transfer agreement was not present in *Clay*.

To the extent that *Clay* is inconsistent with the conclusions reached in *Kurihara*, *Hass*, and *Barratta–Lorton*, these cases provide the better rule by following the substance over form approach advocated in *First National*. Alternatively, assuming that the decision in *Clay* states a test for defining "transfer" which is different from the factors relied upon in *Barratta–Lorton* and *Hass*, the facts present in this case indicate that Joan actively participated in the insurance purchase decisions.[4] In *Clay*, the wife made the sole decision to purchase insurance, not as a part of a mutual insurance policy purchase, but because decedent qualified as a "key man" in the corporations controlled by the wife and her family. *Clay*, 86 T.C. at 1268–69. The insurance was purchased pursuant to "key man" insurance provisions in the Code, and the decedent was not consulted concerning

---

**4.** Appellant's speculation that Joan would not have consented to an additional amount without the reciprocity involved in mutual insurance policies is supported by facts in the record. William testified that two policies had been purchased on his life, totalling $1,000,000. Additionally, the record reveals that Joan had twice consulted her attorney regarding a divorce. Joan had her attorney draw up a will that disinherited William in July of 1979, shortly before

her death. Around this time William called the insurance agent regarding increased coverage on Joan's life. When combined with the fact that the agents testified that they met with and discussed both policies with Joan and William, the testimony supports a conclusion that the insurance purchases were part of an integrated scheme to avoid estate taxes in which both Joan and William participated.

the policy amount or as to reciprocal policies to be taken out on the wife's life. At the least, the reasons for purchase and mutuality of the transaction distinguishes this case from the situation in *Clay*. Under either interpretation of *Clay's* reasoning, the facts of this case support a finding that a transfer occurred within the meaning of § 2035.

### CONCLUSION

Recent Tax Court precedent is consistent with the reasoning initially advanced in *First National*. The court below relied on language in *Clay* which can be harmonized with other recent Tax Court cases that support a conclusion that a transfer occurred. Alternatively, the reasons for and structure of the purchase distinguishes this case from *Clay*. Therefore, the Tax Court determination that the policy proceeds are not includable in decedent's gross estate is reversed.

REVERSED AND REMANDED.