**PACIFIC FIRST FEDERAL SAVINGS BANK, Petitioner–Appellee,**

v.

**COMMISSIONER INTERNAL REVENUE SERVICE, Respondent–Appellant.**

**No. 91–70116.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 9, 1991.

Decided Feb. 7, 1992.

As Amended on Denial of Rehearing and Rehearing En Banc May 21, 1992.

Bruce R. Ellisen, Tax Div., U.S. Dept. of Justice, Washington, D.C., for respondent-appellant.

John F. Coverdale, Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C., for petitioner-appellee.

Before WALLACE, Chief Judge, HUG and RYMER, Circuit Judges.

WALLACE, Chief Judge:

The Commissioner of Internal Revenue (Commissioner) appeals the tax court's decision that Treasury Regulation § 1.593–6A(b)(5)(vi), (vii) is invalid because it does not implement the congressional mandate in a reasonable manner. The tax court had jurisdiction pursuant to I.R.C. §§ 6214, 7442. (All references are to the Internal Revenue Code of 1954 (Code or I.R.C.), unless otherwise indicated.) We have jurisdiction over this timely appeal pursuant to I.R.C. § 7482. We reverse and remand to the tax court for further proceedings.

I

During the relevant period, Pacific First Federal Savings Bank (Pacific) was a mutual savings and loan association with its principal place of business in Tacoma, Washington. Pacific claimed deductions for reasonable additions to a reserve for bad debts for the taxable years 1971

through 1980. The Code provides special rules for determining reasonable additions to reserves for domestic building and loan associations, mutual savings banks, and certain cooperative banks (collectively referred to as "mutual institutions"). *Id.* § 593(a). In general, mutual institutions may deduct "the amount determined by the taxpayer to be a reasonable addition to the reserve for losses on qualifying real property loans," but that amount may not exceed a cap determined under one of three alternative methods: (1) the percentage of taxable income method, under which the deduction is equal to a specified percentage of the institution's taxable income; (2) the percentage of loans method, under which the deduction is based on a specified percentage of the relevant loans; and (3) the experience method, under which the deduction is based on the taxpayer's bad debt history. *Id.* §§ 593(b), 585(b). The mutual institution may choose the method that provides the highest deduction. *Id.* § 593(b)(1)(B).

During the relevant years, Pacific used the percentage of taxable income method to compute its reserve deduction. Pursuant to section 593, the percentage rate used to determine the deduction for 1971 was 54 percent. The rate was gradually reduced each year until it reached 40 percent for 1979 and each year thereafter. *Id.* § 593(b)(2)(A).

During the taxable years 1981 and 1982, Pacific sustained net operating losses in the amounts of $43,459,246 and $27,748,382, respectively. At that time, the Code permitted mutual institutions to carry back net operating losses to each of the ten taxable years preceding the year of the loss. *Id.* § 172(b)(1)(F). The net operating loss is first carried back to the earliest permissible year, with any unabsorbed amount carried forward chronologically until fully absorbed. *See id.* § 172(b)(2). When carried back, the net operating loss is treated as a deduction, thereby reducing taxable income for that year. The taxpayer then receives an appropriate refund. Pacific carried its 1981 net operating loss back to the years 1971 through 1978 and carried its 1982 net operating loss back to

the years 1978 and 1979. Pacific did not make any adjustment to its bad debt reserve deductions for the years 1971 through 1979, even though taxable income for those years was reduced by the loss carry-backs.

During an audit, the Commissioner determined that because the net operating loss deduction reduced taxable income for the carry-back years, Pacific was required to recalculate its reserve deductions. Although earlier regulations issued by the Secretary of the Treasury (Treasury) indicated that the reserve deduction did not need to be recalculated, the regulation in effect when Pacific's net operating losses occurred provides that deductions for section 172 losses reduce taxable income for purposes of determining the allowed reserve deduction. *Compare* Treas.Reg. § 1.593–6(b)(2)(iv) (1971) (taxable income for purposes of section 593 is not reduced by section 172 losses) *with* Treas.Reg. § 1.593–6A(b)(5)(vi), (vii) (1982) (for the relevant years, taxable income for purposes of section 593 is reduced by section 172 losses). The Commissioner contended that pursuant to the applicable regulations, Pacific was required to recompute its reserve deductions for the loss carry-back years. According to the Commissioner, Pacific's income taxes for 1978, 1979, and 1980 were deficient in the amounts of $1,743,066, $5,057,885, and $2,512,321, respectively.

Pacific petitioned the tax court seeking redetermination of the deficiencies. Pacific argued that Treasury Regulation § 1.593–6A(b)(5)(vi), (vii) is an unreasonable interpretation of the statute and, therefore, invalid. The tax court, in a 13–5 reviewed decision, held that the regulation was invalid. *See Pacific First Federal Savings Bank v. Commissioner*, 94 T.C. 101, 107 (1990) (*Pacific First*).

## II

■ The Commissioner argues that the tax court erred in invalidating Treasury Regulation § 1.593–6A(b)(5)(vi), (vii). The only other circuit court to address this issue has criticized and rejected the tax

court's decision in *Pacific First. See Peoples Federal Savings & Loan Association of Sidney v. Commissioner*, 948 F.2d 289, 291, 303–305 (6th Cir.1991) (*Peoples Federal*); *see also First Federal Savings Bank of Washington v. United States*, 766 F.Supp. 897, 899–900 (E.D.Wash.1991), *appeal docketed*, No. 91–35690 (9th Cir. May 21, 1991) (rejecting the tax court's decision in *Pacific First* and upholding the regulation). "Uniformity among the circuits is especially important in tax cases to ensure equal and certain administration of the tax system. We would therefore hesitate to reject the view of another circuit." *First Charter Financial Corp. v. United States*, 669 F.2d 1342, 1345 (9th Cir.1982) (*First Charter*). We believe much of the Sixth Circuit's reasoning is persuasive, and write separately only to clarify the analysis supporting the validity of the regulation.

### III

■ In the past, there has been some ambiguity in our circuit over the proper scope of review of tax court decisions. *Estate of Schnack v. Commissioner*, 848 F.2d 933, 935 (9th Cir.1988) (*Estate of Schnack*). The parties have stipulated to the facts in this case. Therefore, we are only faced with a question of law concerning the validity of the regulation, which we review de novo. *Id.* Some of our earlier decisions, however, appear to indicate that deference should be given to decisions of the tax court. *See, e.g., First Charter*, 669 F.2d at 1345. In *Vukasovich, Inc. v. Commissioner*, 790 F.2d 1409, 1411–13 (9th Cir. 1986), we recognized the difficulty with some of our previous decisions and concluded that, in general, no special deference should be given the tax court when reviewing a pure question of law. *See also Lynch v. Commissioner*, 801 F.2d 1176, 1178–79 (9th Cir.1986) (no deference to tax court's conclusions of law). This interpretation of our circuit's case law history was followed in *Estate of Schnack*, 848 F.2d at 935,

■ Even if deference to the tax court on a legal question is proper in certain circumstances, such deference would be inappropriate in this appeal. The purpose of deferring to legal decisions of the tax court is to foster the value of tax law uniformity. As we pointed out in *Vukasovich*, in the realm of national tax law, "it is more important that the applicable rule of law be settled than it be settled right." 790 F.2d at 1413, *quoting Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406, 52 S.Ct. 443, 447, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting). Therefore, we conclude that in cases such as this one, where the tax court decision has been thoroughly considered and rejected by another circuit, no special deference should be given to the tax court's conclusions of law.

■ The parties also disagree over the degree of deference to be given to the Treasury's regulation. The challenged regulation was issued under the Treasury's authority to "prescribe all needful rules and regulations...." I.R.C. § 7805. The Sixth Circuit concluded that the rule of deference established by *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (*Chevron*), should be applied to this interpretive regulation. *See Peoples Federal*, 948 F.2d at 299–300. We need not decide whether *Chevron* applies to the regulations in this case, however, because the traditional rule of deference to Treasury regulations supports our decision to uphold the challenged regulation. The Supreme Court has consistently held that courts must defer to the Treasury's interpretive regulations if they "implement the congressional mandate in some reasonable manner." *National Muffler Dealers Association v. United States*, 440 U.S. 472, 476, 99 S.Ct. 1304, 1306, 59 L.Ed.2d 519 (1979) (*National Muffler*) (internal quotations omitted); *see also Cottage Savings Association v. Commissioner*, —— U.S. ——, 111 S.Ct. 1503, 1508, 113 L.Ed.2d 589 (1991) (Treasury's interpretations of the Code should be upheld "so long as they are reasonable").

■ In determining whether the regulation is consistent with the congressional mandate, "we look to see whether the regulation harmonizes with the plain language

of the statute, its origin, and its purpose." *National Muffler*, 440 U.S. at 477, 99 S.Ct. at 1307. The majority of the tax court apparently determined that this "harmony" standard requires the reviewing court to engage in a plenary review of the statute and legislative history to determine the appropriate meaning of the Code. *Pacific First*, 94 T.C. at 115. However, *National Muffler* only requires that the court determine whether the challenged regulation is a "reasonable interpretation of the statute's plain language, its origin, and its purpose." *First Charter*, 669 F.2d at 1348.

Pacific contends that an interpretation that is neither longstanding nor consistent with previous interpretations is not entitled to deference. The cases cited by Pacific, however, do not address the deference to be given to a Treasury regulation. *See, e.g., Lynch v. Dawson*, 820 F.2d 1014, 1020 (9th Cir.1987); *United Transportation Union v. Lewis*, 711 F.2d 233, 242 (D.C.Cir. 1983). While recognizing that the consistency and contemporaneity of the Treasury's interpretation are relevant, the Supreme Court in *National Muffler* deferred to a regulation that reversed the Treasury's previous interpretation that was in force for ten years. *National Muffler*, 440 U.S. at 484–86, 99 S.Ct. at 1310–11. *National Muffler* is consistent with recent Supreme Court decisions that have also "rejected the argument that an agency's interpretation 'is not entitled to deference because it represents a sharp break with prior interpretations' of the statute in question." *Rust v. Sullivan*, —— U.S. ——, 111 S.Ct. 1759, 1769, 114 L.Ed.2d 233 (1991), *quoting Chevron*, 467 U.S. at 862, 104 S.Ct. at 2791. Thus, we follow *National Muffler* and reject "the rigid view that an agency may not alter its interpretation in light of administrative experience." *National Muffler*, 440 U.S. at 485, 99 S.Ct. at 1311.

■ Pacific also contends that we should not defer to the regulation because the Treasury did not supply an adequate justification for the regulatory shift. However, a 1978 memorandum written by the Acting Assistant Secretary for Tax Policy to the Secretary of the Treasury clearly indicates that the Treasury was convinced that "the position with respect to taxable income taken in the prior regulation was mistaken and without statutory authority." The memorandum states that the previous regulation "permitted thrift institutions to take unwarranted bad debt deductions through a liberal definition of the term 'taxable income', which is contrary to the definition provided in the Code." This is the same reason the Commissioner has advanced in this case for upholding challenged regulation.

Pacific argues that a different rationale for the new regulation was provided by the Treasury in public notices proposing the regulation and adopting the final regulations. These notices stated that the regulations were being amended to conform to amendments to the Code made by the Tax Reform Act of 1969, Pub.L. No. 91–172, § 432, 83 Stat. 487, 620–23. *See* 36 Fed. Reg. 15050 (1971); T.D. 7549, 1978–1 C.B. 185, 185–86. These notices, however, addressed numerous changes in the regulations, and the justification for the changes was not linked to any single amendment. The justification for each amendment to the regulations would have been clearer had the Treasury published specific reasons for each regulatory change. Nonetheless, the Supreme Court has deferred to a regulation when "[n]othing in the regulations or case law directly explain[ed] the regulatory shift," *see National Muffler*, 440 U.S. at 485, 99 S.Ct. at 1311 (citation omitted), concluding that it was sufficient that an otherwise apparent change in regulations "incorporated an interpretation thought necessary to match the statute's construction to the original congressional intent." *Id.* Therefore, the Treasury's explanation for the regulatory change in this case is also sufficient to warrant deference.

Although we reject Pacific's argument that the regulation should be given no deference, we recognize that the challenged regulation is less persuasive than would be a contemporaneous, long-standing Treasury regulation that had remained in force after Congress considered and reenacted the pertinent Code provisions. However,

we cannot usurp the Treasury's authority and invalidate the regulation unless it is an unreasonable construction of the statute and its legislative history. *See id.* at 488–89, 99 S.Ct. at 1312–13.

### A.

■ The Treasury's regulation is a reasonable construction of the text of sections 593 and 172. Section 593(b)(2) limits the reserve deduction taken by Pacific to a specified percentage of taxable income. Although taxable income is not defined in section 593, it is defined in section 63(a) as "gross income minus the deductions allowed by this chapter." I.R.C. § 63(a). Since section 172 net operating losses are deductions allowed by this chapter, Pacific's reserve deduction appears to be limited by the amount of taxable income remaining after section 172 losses have been deducted.

The Commissioner points out that although section 593 does not expressly state whether deductions for section 172 losses should be excluded from taxable income, the section does exclude certain items normally included within the concept of taxable income. *Id.* § 593(b)(2)(E). In addition, several other Code sections that require computations based on taxable income contain an explicit provision stating that taxable income is calculated without regard to section 172 loss deductions. *See id.* §§ 170(b)(2)(C), 246(b)(1). Applying the principle of *expressio unius est exclusio alterius,* the Commissioner argues that if Congress intended the reserve deduction not to be affected by section 172 losses, Congress would have so provided in the text of the amendment.

Pacific, however, argues that the text can also be construed as supporting the argument that the reserve deduction should not be recalculated when a net operating loss is carried back. Section 172 provides that "[t]he portion of such loss which shall be carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum of the *taxable income* for each of the prior taxable years to which such loss may be car-

ried." *Id.* § 172(b)(2) (emphasis added). Taxable income is defined as "gross income minus the deductions allowed by this chapter." *Id.* § 63(a). Since the deduction for reasonable reserves is a deduction allowable under this chapter, the amount of the net operating loss that may be absorbed in a given year is arguably calculated after the reserve deduction is subtracted from taxable income. Therefore, since both the reserve deduction and the net operating loss deduction are affected by the amount of taxable income, it is necessary to determine which deduction will reduce taxable income first.

The interpretations offered by the Treasury and Pacific both appear reasonable. However, "the choice among reasonable interpretations is for the Commissioner, not the courts." *National Muffler,* 440 U.S. at 488, 99 S.Ct. at 1312. Therefore, we defer to the Treasury's interpretation of the statute.

### B.

The challenged regulation is also a reasonable interpretation of the legislative history. Neither party has provided any evidence that Congress specifically addressed the question whether the reserve deduction should be recalculated after a section 172 loss is deducted from taxable income. Treasury was forced to balance two competing legislative policies underlying section 593. One purpose for allowing bad debt reserve deductions is to encourage mutual institutions to accumulate bad debt reserves. *See Arcadia Savings & Loan Association v. Commissioner,* 300 F.2d 247, 251 (9th Cir.1962) *(Arcadia).* Congressional tax reform, however, has reduced the benefit that section 593 confers upon mutual institutions in order to further a policy of taxing mutual institutions and other corporate taxpayers at a similar rate. *See, e.g.,* Tax Reform Act of 1969, Pub.L. No. 91–172, § 432(a), 83 Stat. 487, 620 (codified at I.R.C. § 593) (reducing the allowable deduction from 60 to 40 percent over a ten-year period); H.R.Rep. No. 413, 91st Cong., 1st Sess., pt. 1, at 125, *reprinted in* 1969–3 C.B. 200, 278 (previous reserve de-

duction allowed "these institutions to pay a much lower average effective rate of tax than the average effective rate for all corporations"). The Treasury amended its regulations to treat mutual institutions more like other taxpayers and to reflect what it perceived was the proper balance between these two competing congressional objectives.

The Treasury was also required to consider the purposes underlying section 172 when amending the regulation. One purpose of section 172 is to improve the equity of the tax system between taxpayers with fluctuating and relatively stable incomes. *See Aetna Casualty & Surety Co. v. United States,* 568 F.2d 811, 819 (2d Cir.1976). Although the purpose of section 172 is clear, the application of the prior regulatory scheme, which was adopted by the tax court majority, results in a windfall to taxpayers with fluctuating income and losses. The prior regulations did not require the reserve deduction to be recalculated when a section 172 loss was deducted from taxable income. *See* Treas.Reg. § 1.593–6(b)(2)(iv) (1971). For example, an institution with $2,000,000 income evenly divided over two years would be taxed as follows:

|  | *1979* | *1980* |
|---|---|---|
| Income before percentage method deduction | 1,000,000 | 1,000,000 |
| Percentage method reserve deduction at 40% | (400,000) | (400,000) |
| Taxable Income | 600,000 | 600,000 |
| Tax at 46% | 276,000 | 276,000 |

However, an institution with an uneven distribution of income would pay significantly less taxes:

|  | *1979* | *1980* |
|---|---|---|
| Income before percentage method deduction | 3,000,000 | (1,000,000) |
| Percentage method reserve deduction at 40% | (1,200,000) | –0– |
| Net operating loss carry-back | (1,000,000) | –0– |
| Taxable Income | 800,000 | –0– |
| Tax at 46% | 368,000 | –0– |

Both hypothetical taxpayers experienced a gain of $2,000,000 over two years, but the prior regulatory scheme allows the second taxpayer to pay a tax of only $368,000 while the first taxpayer pays $552,000. The second taxpayer receives a windfall of $184,000 because its income was distributed unevenly between the two years.

Under the challenged regulation, the first taxpayer pays the same tax as before. The second institution, however, now pays the same tax as the first taxpayer:

|  | *1979* | *1980* |
|---|---|---|
| Income before percentage method deduction | 3,000,000 | (1,000,000) |
| Net operating loss carry-back | (1,000,000) | –0– |
| Taxable income before reserve deduction | 2,000,000 | –0– |
| Percentage method reserve deduction at 40% | (800,000) | –0– |
| Taxable Income | 1,200,000 | –0– |
| Tax at 46% | 552,000 | –0– |

Although Congress did not explicitly state an intention to ameliorate all of the consequences of taxing individuals on an annual basis, the Treasury's regulatory shift avoids inequitable windfalls based on the timing of income and losses. The regula-

tion, therefore, can hardly be deemed unreasonable.

Pacific argues that the Treasury's regulation violates the general purpose of sections 593 and 172 in several ways. First, Pacific contends that the amended regulation undermines depositor safety by essentially repealing the reserve deduction for some taxpayers. Second, Pacific contends that in 1969 the House and Senate specifically considered the effect of the prior regulations on the tax rate in reaching a compromise on how much to curtail the reserve deduction benefit. *See* H.R.Conf.Rep. No. 782, 91st Cong., 1st Sess. 311, *reprinted in* 1969–3 C.B. 644, 664. Pacific asserts that the Treasury's regulatory shift upsets this compromise. Third, Pacific argues that the Treasury's reinterpretation effectively nullifies the ten year carry-back provision by reducing the benefit of carrying back losses.

Although Pacific does not argue that the traditional reenactment doctrine applies in this case, each of Pacific's arguments depends on the assumption that in amending the Code, Congress considered the effect of the prior regulatory scheme, or the desirability of recalculating the reserve deduction when section 172 losses are carried back. "For example, the argument that the Treasury's regulatory shift violates congressional intent because it decreases the incentives to accumulate reserves and threatens depositor safety is premised upon the belief that Congress carefully considered all of the effects of allowing taxpayers to disregard section 172 losses when calculating their reserve deduction." Pacific has presented no persuasive evidence that Congress gave any scrutiny to the prior regulations or otherwise considered whether requiring taxpayers to recalculate reserve deductions when section 172 losses are carried back would threaten depositor safety. The prior regulations were complex and, as discussed above, resulted in differing levels of taxation depending upon the timing of income and losses. Absent clearer evidence that Congress considered the effect of the prior regulations, or the need to disregard section 172 losses when calculating the reserve deduction, we cannot usurp

the Treasury's congressionally delegated authority to interpret this complex scheme.

In addition, Pacific has mischaracterized the effect of the regulation. The regulation does not repeal the percentage of taxable income method or the generous carryback period allowed for mutual institutions. The regulation merely requires that the taxpayer who selected the percent of taxable income method to calculate the reserve deduction take into account the new taxable income figure in the carry-back year. We hold that the regulation is a reasonable exercise of the responsibility delegated by Congress to the Treasury. *National Muffler*, 440 U.S. at 477, 99 S.Ct. at 1307.

## C.

Pacific also contends that the regulation is inconsistent with our decisions holding that "[e]stimates fairly made at the time may not be enlarged in the light of subsequent events...." *See, e.g., Rogan v. Commercial Discount Co.*, 149 F.2d 585, 590 (9th Cir.) (internal quotations omitted), *cert. denied*, 326 U.S. 764, 66 S.Ct. 145, 90 L.Ed. 460 (1945). The Treasury, however, is not requiring mutual institutions to revise an estimate. Section 593 provides a deduction for "the amount determined by the taxpayer to be a reasonable addition to the reserve...." I.R.C. § 593(b)(1)(B). The percentage of taxable income method is merely a means of calculating the cap on what the taxpayer may estimate as a reasonable deduction. The Treasury's regulation only requires a permissible adjustment "of the formula determining the limits of the reserve allowable." *See Rio Grande Building & Loan Association v. Commissioner*, 36 T.C. 657, 668 (1961) (dicta).

Pacific contends that section 593(b)(2) is more than a method of calculating the limit on the deduction. Pacific relies on *Arcadia* for the proposition that the percentage of taxable income method "furnishes a formula for measuring a reasonable addition to a reserve for bad debts...." *Arcadia*, 300 F.2d at 251. In *Arcadia*, however, we were not asked to decide whether the percentage of taxable income method is (1) a

formula for calculating what is a reasonable addition to reserves, or (2) a formula for determining the limit on what a taxpayer may deem to be a reasonable addition. Thus, *Arcadia* is not dispositive here.

Moreover, Pacific's reliance on *United States v. Foster Lumber Co.*, 429 U.S. 32, 97 S.Ct. 204, 50 L.Ed.2d 199 (1976), is also misplaced. *Foster Lumber* only addresses whether capital gains income must be included in the taxable income offset by net operating loss deductions. *Id.* at 33–36, 97 S.Ct. at 206–07. The Court did not decide the scope of the term "taxable income" in light of the purposes behind sections 172 and 593.

## IV

Pacific contends that even if the regulation is upheld as a reasonable construction of the statute, the retroactive application of the regulation is invalid. Pacific raised this issue below, but the tax court did not reach the retroactivity question because it invalidated the regulation. We remand this case to allow the tax court to address this issue in the first instance. We express no view the question whether the Commissioner is applying the regulation retroactively in this case.

REVERSED AND REMANDED.

HUG, Circuit Judge, dissenting:

I respectfully dissent. I would affirm the judgment of the Tax Court based upon the well-reasoned opinion of Judge Wells writing for the majority of the Tax Court. *Pacific First Federal Savings Bank v. CIR*, 94 U.S. Tax Court Reports 96 (1990).