30 F.3d 139
 74 A.F.T.R.2d 94-5795
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
ESTATE OF John T. HEDRICK, deceased; Betsy Phillips,
Special Administrator, Petitioners-Appellants,
v.
COMMISSIONER INTERNAL REVENUE SERVICE, Respondent-Appellee.
 No. 92-70785.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 3, 1994.
Decided Aug. 5, 1994.
 
 1
 Before: BROWNING and FLETCHER, Circuit Judges, and FITZGERALD,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Betsy Phillips, Administrator of the estate of decedent John T. Hedrick, appeals a decision of the tax court denying the estate a marital deduction under 26 U.S.C. Sec. 2056. She argues that the court erroneously interpreted the Hedricks' Declaration of Trust (the "Declaration") to provide that once John Hedrick died, his wife did not have the power to revoke the trust with respect to his share of their community property held in trust.
 
 
 4
 We have jurisdiction under 26 U.S.C. Sec. 7482(a)(1). We find that the Declaration is ambiguous on its face, but that when it is read in conjunction with available extrinsic evidence it reveals an intent to make the trust fully revocable during the survivorship period, and thus qualifies the Estate for the marital deduction. We reverse.
 
 FACTS AND PROCEDURAL HISTORY
 
 5
 John T. and Cecil Hedrick were married for about 50 years; they were Seventh Day Adventists and had no children. In the early 1980s, they decided to leave the bulk of their estate to various religious organizations, principally to the "Council for Religious Freedom," a nonsectarian charitable organization which the Hedricks themselves helped to found.
 
 
 6
 In 1984 John Hedrick learned that he had a fatal illness and asked an attorney, David Larkin, for his help in drafting an estate plan. Larkin proposed an inter vivos trust of the sort commonly called an "A-B-C" trust: upon John Hedrick's death, the trust would be divided into three subtrusts: one for his wife (consisting of her separate property and her interest in community property), a marital trust, and a residual trust. The marital and residual trusts were to contain the husband's share of community property and separate property, and were to be irrevocable.
 
 
 7
 Because Larkin was not an experienced estate planner, he sent a copy of the draft trust agreement to Andrew Sussman, an attorney who had more expertise in such matters. In a letter dated October 25, 1985, Sussman replied with two criticisms. First, he opined that the A-B-C form of trust would be substantially more complicated and more expensive to administer, and yet would bring no tax advantages. Second, he did not approve of the provision making part of the trust irrevocable upon John Hedrick's death, as this would result in the Hedricks losing control over some of their assets. Sussman recommended that Larkin rewrite the trust agreement so that upon the death of the first spouse all the assets would stay in a single, revocable trust, and so that upon the death of the survivor the trust would be distributed to the Hedricks' chosen charitable organizations.
 
 
 8
 Larkin discussed Sussman's suggestions with the Hedricks. According to his testimony, they agreed with those suggestions, and directed Larkin to redraft the trust agreement in accordance with them. Larkin's undisputed testimony was that the Hedricks told him to draft an agreement which would make the trust fully revocable until both the Hedricks had died.
 
 
 9
 Instead of starting from scratch, Larkin went back to the draft A-B-C trust and attempted to salvage paragraphs which he thought were still acceptable, and then to supplement them with new material based on Sussman's comments. This shortcut is no doubt the origin of the present litigation.[1] Larkin struck out some of the draft trust's provisions that made at least portions of the trust irrevocable, but left in some provisions which, while not themselves providing for irrevocability, were consistent with irrevocability. For instance, Section I.E. ("Revocation of Trust"), was changed as follows (the underlined portion was removed):
 
 
 10
 At any time and from time to time, during the joint lives of the Trustors, the Trustors jointly as to community property and either Trustor as to his or her separate property may ... revoke the trust created by this Declaration in whole or in part.
 
 
 11
 ER at 65. Although deleted here, Larkin failed to delete the "joint lives" language from other provisions. See, e.g., Section II.C. ("Invasion of Corpus") (authorizing invasion of Trust corpus "[d]uring the joint lives of the Trustors"). The section also fails to specify explicitly that the "joint" action as to community property pertains only while both are alive. In Section IV ("Death of Survivor"), the Trust Declaration states--in a provision not contained in the draft trust--"[o]n the death of the Survivor, the Trust shall become irrevocable." This is the only place in the Declaration which explicitly provides for irrevocability and it is explicit that irrevocability pertains only when the survivor dies. Admittedly, the Declaration nowhere expressly provides for a complete power of revocation by the survivor during the survivorship period.
 
 
 12
 The Hedricks executed the Declaration of Trust on January 21, 1986, and transferred the bulk of their estate into the trust. A few days later, John Hedrick executed a Last Will and Testament, in which he directed that certain personal property go to his wife, and the remainder of his estate to the Trust. John Hedrick died on September 4, 1986, and was survived by his wife.
 
 
 13
 On December 9, 1987, Cecil Hedrick filed a Federal Estate Tax Return for her husband's estate. She reported his gross estate as $1,621,509 and claimed a marital deduction in the amount of $1,618,523 (the gross estate minus funeral expenses of $2,986). In effect, she claimed that the terms of the Trust gave her the requisite control over his estate, to qualify for the marital deduction.
 
 
 14
 On July 30, 1990, the IRS issued a notice of deficiency, claiming that taxes of $384,284 were due on John Hedrick's estate. The IRS allowed Cecil Hedrick a marital deduction for property valued at $155,071, which passed directly to her upon her husband's death and which was outside of the trust. The IRS claimed that John Hedrick's $1,463,452 share of the trust did not qualify for the martial deduction because it became irrevocable on John Hedrick's death.[2]
 
 
 15
 Cecil Hedrick filed a petition for review in the United States Tax Court. She died, however, on May 29, 1991, and John Hedrick's cousin, Betsy Phillips, was appointed special administrator for the Hedricks' estate, for the limited purpose of pursuing this litigation. Before the Tax Court, the Estate argued that Cecil Hedrick had the power to revoke the trust in whole upon her husband's death. It conceded that the Trust Declaration did not expressly state such a power. It claimed, rather, that the trust instrument was ambiguous on this point, and that (a) the statutory and judicial presumptions favor revocability, and (b) extrinsic evidence demonstrates that the Hedricks intended to make the entire trust revocable by the surviving spouse.
 
 
 16
 The Tax Court held that the language of the Declaration, which provided the power to revoke by "the Trustors jointly as to community property and either Trustor as to his or her separate property", gave Cecil Hedrick the power to revoke the trust only with respect to her one-half of the community property.[3] The court refused to consider the Declaration ambiguous, and thus refused to consider parol evidence concerning the Hedricks' intentions. The court found that the trust's terms were entirely consistent with its view that John Hedrick's share of the estate became part of an irrevocable trust upon his death. Consistent with its conclusion that the instrument was not ambiguous, the court was unwilling to consider the differences between the Declaration and the original draft trust provided by Larkin. It did note that the draft trust was a document which had been drafted for a different client and presented to the Hedricks merely as a "point of reference." The court also noted that the "during their joint lives" language in the Declaration, which failed to provide for distribution of income or for invasion of the corpus during the survivorship period, was consistent with the idea that the Hedricks had not intended that the entire trust be revocable by Cecil Hedrick.
 
 
 17
 In denying the estate's motions for reconsideration and to vacate its decision, the court further said,
 
 
 18
 even if we were to consider the extrinsic evidence offered by petitioner, we would not be persuaded that the decedent clearly intended that his surviving spouse would be able to revoke the trust with respect to his share of the community property. The most persuasive evidence concerns decedent's intention to benefit particular charities rather than to allow revocation or alteration of that intent by the surviving spouse.
 
 
 19
 Order of Aug. 27, 1992, at 1.
 
 DISCUSSION
 
 20
 On appeal, the estate argues that the Trust Declaration is ambiguous, that parol evidence should therefore be considered, that such evidence indicates that the Hedricks clearly intended the entire trust to be revocable during the survivorship period, and that the estate was therefore entitled to a marital deduction for John Hedrick's share of the community property.[4] We review de novo the Tax Court's interpretation of the Trust Declaration and its refusal to consider parol evidence. Pacific First Federal Sav. Bank v. Comm'r, 961 F.2d 800, 803 (9th Cir.), cert. denied, 113 S.Ct. 209 (1992); see Aetna Casualty and Sur. Co. v. Pintlar Corp., 948 F.2d 1507, 1511 (9th Cir.1991) (whether contract language is ambiguous is a question of law). To the extent the Tax Court made any factual determinations, we review for clear error. United States v. Derr, 968 F.2d 943, 945 (9th Cir.1992).
 
 
 21
 The Estate argues that "the ambiguity arises from the absence of instructions concerning operation of the Hedrick Trust during the survivorship period." Appellant's Brief at 15. Not only does the Trust neither expressly grant nor withhold the power of revocation or modification during the survivor's lifetime; it is also silent as to the enjoyment of income.[5] The Tax Court held, and the Commissioner now contends, that this silence concerning the survivorship period does not demonstrate an ambiguity, but rather is entirely consistent with the following reading of the trust: John Hedrick, whose overriding desire was to see his estate go to the cause of religious liberty, meant for his one-half share of the community property to pass into an irrevocable trust upon his death. In effect, the Commissioner argues that upon John Hedrick's death, the Hedrick Trust split into a revocable survivor's trust (for Cecil), and an irrevocable residual trust (containing John's half of the community property, and payable to the religious beneficiaries upon Cecil's death).
 
 
 22
 Whether we agree with the Commissioner or the Estate, we must read certain provisions in and certain others out. That being the case, the Declaration is ambiguous and the Tax Court was wrong to exclude extrinsic evidence from consideration. Kropp v. Sterling Sav. & Loan Assn., 9 Cal.App.3d 1033, 88 Cal.Rptr. 878 (4th Dist.1970); Estate of Russell, 69 Cal.2d 200, 70 Cal.Rptr. 561 (1968).
 
 
 23
 The "sub-trust" arrangement the Commissioner reads into the Declaration is one of the draft provisions Larkin first presented to Hedrick, had criticized by Sussman,[6] and ultimately deleted from the Hedrick Trust. Larkin unquestionably knew how to create a sub-trust out of John Hedrick's share of the community property, but he excised that provision. At trial, he said that he drafted the original A-B-C trust with the help of Drafting California Revocable Living Trusts (2d ed. 1984), a text which provides clear language for the creation of "exemption" and "residual" trusts out of the deceased spouse's property, while leaving the surviving spouse's share in a "survivor's trust." Id. at 112-18. While Larkin's draft A-B-C trust contained such language, the Declaration does not.
 
 
 24
 Moreover, much of the language in the Declaration could only have been written under the assumption that the trust was to remain unitary, even after the first spouse's death. For instance, section III ("Death Of First Trustor") provides that "the Trustee ... may pay out of the Trust Estate" various debts and funeral costs. ER at 11 (emphasis added). Section IV ("Death of Survivor") provides that "[o]n the death of the Survivor, the Trust shall become irrevocable." ER at 12 (emphasis added). Referring to "the" Trust in these contexts belies the Commissioner's contention that there were two subtrusts after John Hedrick's death.
 
 
 25
 The Declaration's inconsistent use of "during the joint lives of the Trustors" language bespeaks more of careless drafting than significant meaning. Sections I.F. ("Modification of Trust") and II.A. ("Net Income to Trustors") clearly apply only during the joint lives of the Trustors, but the crucial section I.E. ("Revocation of Trust") contains no such language. Such language was present in the draft A-B-C trust, however, and was expressly deleted by Larkin in creating the Declaration. The clearest expression of intent is the statement that "on the death of the survivor the trust becomes irrevocable." Id. (emphasis added).
 
 
 26
 The Commissioner cites a number of cases in an attempt to make his interpretation of the Declaration seem legally compelled. None are apposite. Estate of Boydstun v. Commissioner, 48 T.C.M. (CCH) 311 (1984), aff'd, 774 F.2d 1173 (9th Cir.1985), turned on the presence of explicit "joint lifetime" language in the Trust's revocation provision. E.g., id. at 84-1211 ("[the husband's] right to revoke was limited by the words 'during the joint lifetimes of the Settlors' "). It is exactly such "joint lifetime" language which is absent in the Hedrick Trust--and indeed was deleted from the draft A-B-C trust.[7] Khan v. Estate of Khan, 168 Cal.App.3d 270, 214 Cal.Rptr. 109 (2d Dist.1985), dealt with a divorce situation in which the husband sought to revoke a trust just prior to his death, in order to keep its assets from his estranged wife. As in Boydstun, the Khan court was persuaded by the language of the Trust itself, which read
 
 
 27
 We reserve unto ourselves the power and right at any time during our lifetime to amend or revoke in whole or in part the trust....
 
 
 28
 Id. at 110 (emphasis supplied by the court). Unremarkably, the court held that this language did not authorize unilateral revocation by one estranged spouse, while the other was still alive.[8]
 
 
 29
 The Estate has the better argument. It contends that the available extrinsic evidence compels the conclusion that the Hedricks intended the trust to be fully revocable by Cecil Hedrick during the survivorship period. We agree. The extrinsic evidence consists of Larkin's draft A-B-C Trust, Sussman's letter critiquing it, and testimony by Larkin, Betsy Phillips, and John Stephens (a Seventh Day Adventist Minister and president of the Council on Religious Freedom).
 
 
 30
 Larkin, Phillips, and Stephens all testified that John and Cecil Hedrick were in complete agreement as to the ultimate distribution of their estate to charities, and that they had always been partners in their business dealings. Larkin and Stephens further testified that John Hedrick had specifically told them that the Trust was to be fully revocable by Cecil after his death. The witnesses's testimony does not support the tax court's finding that John Hedrick was more concerned with leaving his money to charity than with granting his wife full control over their estate until her death. There is nothing to suggest the Hedricks were not of one mind as to the disposition of their assets.
 
 
 31
 In this context, the draft A-B-C trust, Sussman's letter, and the changes to the draft trust in creating the final document take on particular significance. Sussman's letter was obviously based on the assumptions that (1) the Hedricks wanted their entire estate to go to charity, and (2) John Hedrick had no reason to fear that his wife would misuse the estate during the survivorship period. He therefore recommended to Larkin, for purposes of "control" and for tax reasons, that the trust be fully revocable until Cecil's death.
 
 
 32
 Larkin's response was to (a) delete the provisions creating three subtrusts upon the first trustor's death, (b) delete a provision which stated that the trust would become irrevocable upon the death of the first trustor, (c) add a provision that the trust would become irrevocable on the death of the survivor, and (d) delete the "during the joint lives" language from the paragraph granting the trustors a power of revocation. We agree with the Estate that these actions, viewed in context, evidence an intent to follow Sussman's advice and create a single, fully revocable trust.
 
 
 33
 The extrinsic evidence clearly indicates that Larkin and the Hedricks were aware of the tax consequences of their various trust options. They knew that a fully revocable trust would be subject to no tax liability at all upon John Hedrick's death (because of the marital deduction), and to no tax liability on Cecil's death (because it would go to charity). They also knew that were a portion of the trust made irrevocable on John's death, the Estate would not be entitled to the marital deduction for that portion. There is not a scintilla of evidence to support a finding that John Hedrick was so concerned about what his wife might do with his part of the trust during the survivorship period that he was willing to expose the Estate to over $300,000 in tax liability in order to protect it from her dissipation.
 
 
 34
 We reverse the decision of the tax court. Because the trust was wholly revocable during Cecil's lifetime, the Estate is entitled to the marital deduction under 26 U.S.C. Sec. 2056, and thus to a vacation of the judgment of tax deficiency.
 
 
 35
 REVERSED.
 
 
 
 *
 Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 See Trial Transcript at 83 (Larkin's testimony) ("[t]his ... is one of the dangers of using an existing trust and taking boilerplate language and adopting it where it was appropriate in one situation and it was not. And I would have to accept criticism, you know, of the use of this.")
 
 
 [2]
 Meanwhile, Cecil Hedrick filed a "Petition for Instructions Concerning Revocability of Living Trust Instrument" in California probate court. On August 8, 1989, the probate court found that the trust agreement contained "no express statement of irrevocability, and is therefore fully revocable until the death of the second spouse." T.C. memo of July 21, 1992, at 7. The court also found that "the intent of the trustors ... was to make the trust fully revocable until the death of the second spouse." Id. (emphasis added)
 
 
 [3]
 The court specifically noted that it was not bound by the California probate court's contrary finding
 
 
 [4]
 26 U.S.C. Sec. 2056 allows a deduction from a deceased spouse's gross estate for the value of any property passing from decedent to the surviving spouse. Terminable interests are not includable in this deduction. Id. Sec. 2056(b)(1)
 
 
 [5]
 This is because the relevant sections apply only "during the joint lives of the Trustors."
 
 
 [6]
 Sussman clearly said to Larkin, "[m]y recommendation is ... to rewrite these provisions [in the draft trust] to provide that upon the death of the first spouse to die all assets stay in the revocable trust." ER at 53. Sussman understood that there was no need for subtrusts upon the first spouse's death, since both spouses were in agreement that all of their money would ultimately go to charity
 
 
 [7]
 Similarly distinguishable is another authority cited by the Tax Court: Schwarz, "California Community Property and Revocable Inter Vivos Trusts: A Word of Caution," Taxes 316 (May 1966). The trust discussed there specifically provided that community property transferred to the trust became the husband's separate property. Id. at 317
 
 
 [8]
 The same analysis applies to Hill v. Connover, 191 Cal.App.2d 171, 12 Cal.Rptr. 522 (2d Dist.1961), cited in Khan and by the Commissioner here. Hill also considered an alleged "testamentary" revocation while both spouses were still alive